**M.T. BONK COMPANY and Mark T. Bonk, Plaintiffs–Appellants,**

v.

**MILTON BRADLEY COMPANY and Hasbro, Inc., Defendants–Appellees.**

Nos. 90–1678, 90–2807.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1991.

Decided Oct. 16, 1991.

---

**3.** They are Edwards, Raji, Stover, Bennett and Griffin.

Elizabeth J. Guscott (argued), Chicago, Ill., for plaintiffs-appellants.

Richard G. Schultz, Steven H. Gistenson (argued), Foran, Wiss & Schultz, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, RIPPLE and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Mark T. Bonk invented and marketed a board game he entitled "Play it Again Juke Box," in which players were challenged to complete a phrase from a popular song after being given a few words of the lyrics. He sent the game to a number of toy and game manufacturers, including the Milton Bradley Company and Hasbro, Inc. (Milton Bradley), in an attempt to interest them in licensing it. Milton Bradley responded and a meeting was arranged.

At that meeting, a representative of Milton Bradley explained to Bonk that products under consideration are reviewed over the course of a series of meetings to determine if they will become part of the company's product line. Between each meeting, research and development is performed, modifications or changes may be made, and advertising presentations are developed. He was also informed that during the review process Milton Bradley will begin to negotiate a licensing agreement with the inventor. Bonk was warned that a product may be removed from the review process by Milton Bradley at any time for a number of reasons and that a product can even be canceled after reaching the manufacturing stage.

When asked what rights he had to the copyrighted song lyrics used in the game, Bonk responded that, while he had not acquired the rights to the lyrics, he was entitled to use them in the game.

A copy of Milton Bradley's standard licensing agreement was sent to Bonk's attorney for review. A letter attached to the agreement stated that much of the terminology of the agreement would become part of the conditions under which Milton Bradley would license the game. The standard contract set forth the rights and obligations of the parties and contained a provision that required the inventor to warrant that the product "does not violate or infringe any rights of others."

Two months later, another representative of Milton Bradley telephoned Bonk and informed him that the game would be presented at the next meeting, although the company was concerned about the use of the copyrighted song lyrics. Nevertheless, Milton Bradley remained interested in negotiating for licensing of the game. Several factors that would be involved in the negotiations were discussed and Bonk was informed that, in the event they were to reach an agreement, Milton Bradley would expect Bonk to stop distribution of the game.

Shortly thereafter, Bonk told the company he would discuss the matter with his attorney and that he wanted his attorney involved in any subsequent negotiations for the game.

Over the next several months, Bonk's attorney negotiated with Milton Bradley to

establish a licensing agreement. Milton Bradley indicated it was concerned that there were copyright violations with the song lyrics used in the game and that resolution of this issue was critical.

In the end, Milton Bradley determined that Bonk had no right to use the copyrighted song lyrics in the game under "the Fair Use Doctrine." Milton Bradley canceled all negotiations with Bonk and the game was withdrawn from the review process.

Bonk brought an action against Milton Bradley alleging breach of contract. After trial, a jury returned a verdict in favor of Milton Bradley and against Bonk. Dissatisfied with the verdict and denial of his motion for a new trial, Bonk raises several issues on appeal.

First, Bonk argues that the district court erred in denying his motion for a new trial because the verdict was contrary to the evidence which showed that he had an oral contract or, alternatively, a contract by promissory estoppel, with Milton Bradley. Second, Bonk claims that the court's limitation of his counsel's examination of a witness and related comments by the district judge denied him a fair trial. And, finally, Bonk argues that the district court erred in awarding $31,111.10 in costs to Milton Bradley.

■■■ Our review of the district court's denial of Bonk's motion for a new trial is governed by federal law, even in a diversity case. *Wassell v. Adams*, 865 F.2d 849, 854 (7th Cir.1989). A new trial may be granted only if the verdict is against the clear weight of the evidence, and we will reverse the district judge's decision only where there is a clear abuse of discretion. *Id.* Thus, we will not set aside a jury verdict if a reasonable basis exists in the record to support that verdict. *Bay State Milling Company v. Martin*, 916 F.2d 1221, 1226 (7th Cir.1990). In examining a jury's verdict, we view the evidence in the light most favorable to the prevailing party and the question of credibility and weight of evidence is within purview of the jury. *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716 (7th Cir.1985).

■■ As a federal court sitting in diversity, we must apply state law to resolve all substantive questions. *Havoco of America, Inc. v. Hilco, Inc.*, 799 F.2d 349, 352–53 (7th Cir.1986). The parties do not dispute that Illinois law governs here. In determining whether an oral contract exists, the trier of fact must determine whether there was a meeting of the minds between the parties with respect to the terms of an agreement and whether the parties intended to be bound to the oral agreement. *Lal v. Naffah*, 149 Ill.App.3d 245, 102 Ill.Dec. 806, 808, 500 N.E.2d 699, 701 (1986); *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill.2d 133, 102 Ill.Dec. 379, 382, 500 N.E.2d 1, 4 (1986). In order for an oral contract to be binding and enforceable, the contract terms must be definite and certain. *Rybak v. Provenzale*, 181 Ill.App.3d 884, 130 Ill.Dec. 852, 856, 537 N.E.2d 1321, 1325 (1989).

■■ The evidence most favorable to Milton Bradley indicates that there was no meeting of the minds between Bonk and Milton Bradley. Although Bonk claims that he and Milton Bradley entered into an oral contract for licensing the game in their telephone conversations, it is apparent from the continuing negotiations that there was no mutual assent to the terms of an agreement and that the terms of an agreement were not definite and certain.

Moreover, the parties did not intend to be bound absent a written agreement. The negotiations indicate that a written document was contemplated as their conclusion. *See Ceres*, 102 Ill.Dec. at 382, 500 N.E.2d at 4. In fact, Bonk admitted that he and a representative of Milton Bradley discussed putting their agreement into writing.

Before beginning negotiations with Milton Bradley, Bonk's attorney received a copy of Milton Bradley's standard licensing agreement. The letter attached to the agreement stated that much of the terminology of the agreement would become part of the conditions under which Milton Bradley would license the game. The standard contract set forth the rights and obli-

gations of the parties and provided that it would be the entire agreement of the parties, and that no other representation, oral or written, would be binding on the parties. During the negotiations, Milton Bradley made reference to the standard agreement.

It is also apparent from the correspondence and memoranda of Bonk's attorney that a written agreement was to be executed before the parties would be legally bound. In the writings, he referred to "the time of execution of the agreement." In addition, drafts of license agreements, prepared by Milton Bradley, were sent to Bonk's attorney and revisions of the draft contracts were discussed.

Bonk suggests that the research and development of the game during the review process indicates that Milton Bradley believed a contract existed. However, Bonk was informed during his initial meeting with the company that extensive work on the game would be conducted during the review process but that consideration of the game could be canceled at any time.

■ As an alternate ground, Bonk contends that a contract with Milton Bradley arose by promissory estoppel. To establish a claim based on promissory estoppel, Bonk must allege and prove that (1) Milton Bradley made an unambiguous promise to him, (2) he relied on that promise, (3) his reliance was expected and foreseeable by Milton Bradley, and (4) he relied on the promise to his detriment. *Quake Const., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (1990). In addition, his reliance must have been reasonable and justifiable. *Id.*

■ Although Milton Bradley did not make an unambiguous promise to Bonk to license the game, Bonk nonetheless assumed he had a deal. After his initial contact with the representative of Milton Bradley, Bonk immediately dismantled his own company. He terminated all marketing, promotions, and manufacturing, sold a portion of the remaining inventory at a discount, did not attend an international toy fair to promote the game, and refused all other offers and proposals from third parties to purchase the rights to the game.

However, Bonk's reliance was unreasonable and could not have been expected or foreseen by Milton Bradley. He was informed at the initial meeting about the review process and the possibility that a product considered for licensing could be canceled at any time during the process. Because Bonk's reliance was unreasonable, whether he relied to his detriment is irrelevant.

There is more than sufficient evidence upon which a reasonable jury could determine that no contract existed between Bonk and Milton Bradley; therefore, the trial court did not err in denying Bonk's motion for a new trial.

■ Bonk argues that the district court's limitation of his examination of a witness denied him a fair trial. We examine this contention with the following proposition in mind. Trial courts have discretion to place reasonable limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence. *See* Fed.R.Evid. 403, 611; *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1171 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The district court's exclusion of such evidence will not be reversed absent a clear showing of abuse. *Id.* Some time limitation on the length of an examination of a witness may be appropriate under Rules 403 and 611 of the Federal Rules of Evidence.

This was a relatively straightforward breach of contract case which the jury was advised would last about five days. Bonk's case in chief began with his testimony—estimated by his counsel to take "several hours or about a day." But contrary to this estimate, the direct examination of Bonk lasted for three days—a total of eight hours of testimony. Much of his testimony, which, for example, included the minute details of how the game was invented and played, was extraneous to the legal issues of the case. Prior to the second day of trial, out of the presence of the jury, the district judge cautioned Bonk's counsel. She was told not to "continue with this

minutia" and not to "continue to introduce in evidence this irrelevant [and] immaterial matter," or the court would *sua sponte* admonish her. Notwithstanding the judge's warning, the direct examination of Bonk continued in similar fashion. On the third day of trial, following the conclusion of Bonk's direct examination, the district judge again, out of the presence of the jury, indicated his exasperation with the nature and length of the examination. Noting counsel's lack of jury trial experience, the district judge indicated that she was adversely affecting her client's case by her extended examination.

█ Prior to calling Bonk's next witness, his counsel informed the court that the examination would not take more than two to two and one-half hours. Taking her literally, the district judge terminated her direct examination of the witness after two and one-quarter hours (allowing an additional 15 minutes taken for the *voir dire* of the witness by defense counsel). In making an offer of proof with respect to testimony the witness would have given had the direct examination not been terminated, Bonk's counsel stated that the witness (Bonk's attorney in the negotiations) was prevented from testifying "in further detail" as to conversations he had with certain Milton Bradley employees. The district judge rejected this offer of proof but told counsel that she could "expound a bit on redirect." Bonk's counsel extensively examined the witness upon redirect examination and again in Bonk's rebuttal case. Indeed, the record indicates that the witness testified about the content of the conversations on redirect examination. The district court's initial limitation of the direct examination of Bonk's second witness to two and one-quarter hours appears to have been reasonable and was not determinative given the later examination. Bonk was not subject to unfair prejudice. There was no abuse of discretion.

█ Bonk also maintains that comments made by the district judge concerning his trial counsel's performance denied him a fair trial. We disagree. The district judge's comments to counsel regarding her lengthy examinations and presentation of extraneous matters were within the scope of his mandate as a federal trial judge. Moreover, because of his exercise of discretion, most comments were made out of the presence of the jury. The judge's remarks, although made in frustration, do not indicate any bias against Bonk, but a legitimate concern for the manner and mode of the presentation of evidence. Fed.R.Evid. 403, 611.

Bonk also argues that statements made by Milton Bradley's counsel during closing argument were unfairly prejudicial and denied him a fair tlial. Bonk's failure to object to any of the statements waived his right to raise those statements as a basis for appeal. *Deppe v. Tripp,* 863 F.2d 1356, 1364–65 (7th Cir.1988).

Faced with an adverse verdict, Bonk maintains that the district court erred in awarding trial costs to Milton Bradley which totaled $31,111.10. The district court awarded costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and Rule 45(a) of the Rules of the United States District Court for the Northern District of Illinois. We have made it clear that Rule 54(d) creates a presumption that the prevailing party will recover costs, and that the ultimate decision to award costs is within the district court's discretion. *SK Hand Tool Corp. v. Dresser Industries, Inc.,* 852 F.2d 936, 943 (7th Cir.1988), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989); *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.,* 854 F.2d 219, 221 (7th Cir. 1988). The losing party has the burden to affirmatively show that the prevailing party is not entitled to costs. *Id.* at 222.

In reviewing a district court's decision to grant or deny costs to a prevailing party, we will reverse the district court's determination on the reasonableness and necessity of the expenses only for an abuse of discretion. *McIlveen v. Stone Container Corp.,* 910 F.2d 1581, 1582 (7th Cir.1990).

█ Initially Bonk contends that Milton Bradley did not timely file a proper bill of costs. Pursuant to Local Rule 45(a) of the district court, a bill of costs must be filed

by the prevailing party within thirty days of the judgment. Milton Bradley filed a petition for costs within that time period. However, apparently an administrative prerequisite for the clerk to take action in taxing costs in the Northern District of Illinois is the submission of a specific bill of costs form. This requirement is based on custom and practice and is not stated in the local rule.

Milton Bradley's petition adequately set forth itemized costs which were supported with invoices. That would have been sufficient for our purposes, but the district court allowed Milton Bradley to supplement its petition for costs by adding the form used by the clerk (and to amend the petition by *decreasing* its requested costs). The requirements of Rule 54(d) and Local Rule 45(a) were achieved by Milton Bradley's original petition filed within the time allowed. The district court did not err in finding that Milton Bradley's bill of costs was timely and proper.

■■■■ As to the specific costs imposed, Bonk objects to Milton Bradley's deposition costs because the depositions were not used at trial and because they were taken for purposes of investigation, harassment, or raising litigation costs. It is of significance that the depositions in question were supervised by a magistrate. Moreover, the determination of necessity must be made in light of facts known at the time of the deposition, and the introduction of a deposition at trial is not a prerequisite for finding that it was necessary to take the deposition. *Hudson v. Nabisco Brands, Inc.,* 758 F.2d 1237, 1243 (7th Cir.1985); *see SK Hand Tool,* 852 F.2d at 943–44.

The district court adopted the magistrate's determination that the depositions were not taken for the purpose of harassing Bonk and were reasonably necessary. We accept the district court's opinion and agree that Bonk fails to show that Milton Bradley was not entitled to these deposition costs.

■■■■ Bonk also objects to $2,303.40 in copying costs incurred by Milton Bradley alleging that they are unsubstantiated. The expense of copying materials reasonably necessary for use in a case are recoverable costs under 28 U.S.C. § 1920(4).

*State of Illinois v. Sangamo Const. Co.,* 657 F.2d 855, 867 (7th Cir.1981). Like depositions, the underlying documents need not be introduced at trial in order for the cost of copying them to be recoverable. *Id.* Milton Bradley verified that the copying costs included only amounts spent copying documents produced by Bonk and third parties, and pleadings and exhibits submitted to the district court. The district court did not abuse its discretion in awarding Milton Bradley these items as costs.

Finally, Bonk argues $918.45 incurred by Milton Bradley as witness fees for witnesses who did not testify at trial were improperly allowed. He argues these costs were incurred for the purpose of raising litigation costs. The court rejected Bonk's argument on the basis that Milton Bradley did not take any depositions for any improper purpose and that it was not necessary for the witnesses to testify at trial if their deposition testimony was reasonably necessary at the time it was taken. Bonk has not affirmatively shown that the award of these costs was improper.

Bonk's other arguments are without merit and warrant no discussion.

For the foregoing reasons, the judgment of the district court is AFFIRMED.