# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 04-1521 & 04-2263

ALEX F. BEAMON,

*Plaintiff-Appellant,*

v.

MARSHALL & ILSLEY TRUST COMPANY,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 845—**J.P. Stadtmueller**, *Judge.*

_____

ARGUED NOVEMBER 5, 2004—DECIDED JUNE 15, 2005

_____

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Alex Beamon began working as an accountant at Marshall & Ilsley Trust Company ("M&I") in Milwaukee in 1992. Nine years later, Beamon, who is African-American, filed this lawsuit alleging that a dozen discrete job-related actions by M&I amounted to racial discrimination and retaliation for complaining about discrimination and created a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The district court granted M&I's motion for summary judgment and Beamon appeals.

Beamon also appeals the amount of costs awarded to M&I by the district court as the prevailing party below. We affirm in all respects.

## I. Background

The material facts are undisputed but lengthy, given the nature and scope of Beamon's claims. M&I provides trust, employee benefits, and financial services to both individuals and corporations. Beamon began working at M&I in 1992 and for the first five-and-a-half years of his career with the company was employed as a trust fund accountant. In November 1997 he was promoted to a supervisory position in the Income Processing Department, which oversees the daily posting of income into the accounts of M&I's trust clients. This promotion made Beamon M&I's only African-American supervisor at the manager level. The Income Processing Department was "in turmoil" for numerous reasons and suffered from low employee morale. Indeed, Beamon's two predecessors in the position had served abbreviated terms, and the supervisor's job had been vacant for the three months preceding Beamon's promotion. The long-standing problems in the department were not alleviated with Beamon's arrival.

Within the corporate structure at M&I, the Income Processing Department is a subset of Trust Operations, which in turn falls under the jurisdiction of the Support Services Division of the company. In February 1999 the head of the Support Services Division resigned from M&I and a new division chief, Paul Ewig, was brought in to effect a reorganization of M&I's Trust Operations. On March 29, 1999, as part of the reorganization, Ewig removed Beamon from his job as supervisor of Income Processing and transferred him to a position as a "technical consultant" in the Securities Movement and Control area, also known as the "booking area." At that time the only reason given to

Beamon for the transfer was that "changes were being made" and he was to be "a part of those changes." Beamon's new position in the booking area did not involve supervisory or managerial responsibilities, but his salary was not affected by the transfer.

As part of Ewig's reorganization of Trust Operations, two white employees, Tami Hagen and Connie Douglas, were also relieved of their supervisory responsibilities. Douglas was moved from a supervisor in the mutual funds area to a position concentrating on mutual fund exceptions, and Hagen was transferred from supervisor of the booking area to a job in customer service. Douglas received a reduction in pay in connection with this move, while Hagen's salary remained the same. Beamon's prior position as supervisor of Income Processing was filled with a white employee named Mark Cashion. For Cashion, however, the move was not a step up the corporate ladder. He had previously been Manager of Financial Reporting, where in the nomenclature of M&I's corporate hierarchy, he had done "grade 20" work. As supervisor of Income Processing, Cashion did "grade 18" work, supervised fewer employees, and had fewer responsibilities than he had in the Financial Reporting Department.

Beamon's immediate supervisor in the booking area was Scott Joers. Approximately five months after Beamon's transfer, Joers left M&I for a job with another company without first completing the 1998 performance reviews for seven of the eight employees he supervised; Beamon was among the seven employees who did not receive a performance review. Joers did, however, make salary increase recommendations for all eight employees prior to his departure. Joers recommended that Beamon receive a 3.2% pay raise. Ewig, who had the final word on such matters, did not concur with Joers' recommendation. On June 7, 1999, Ewig decided that Beamon should receive no annual salary increase. Ewig's decision was based upon information received from Joers that in February or March 1999, while

still the supervisor of Income Processing, Beamon failed to perform an assigned task that resulted in a $61,000 loss to M&I. Beamon learned that he would not be receiving a raise when he did not see any increase on his July 1999 paycheck.

In July 1999 Beamon was transferred from his position in the booking area to a position on the "Settlement Desk." The record does not disclose how Beamon's pay and grade were affected by this move. In August 1999 Beamon expressed concerns to his new supervisor, Wayne Klomstad, regarding the lack of an annual performance evaluation and raise. Klomstad explained that with the departure of Joers, there was no one currently working for the company who was qualified to evaluate the work Beamon had performed in 1998. However, Klomstad, with the blessing of Ewig, told Beamon that if he "was still with the company" at the end of December 1999, he would receive a 5% bonus.

On August 16, 1999, Klomstad promoted a white employee to the position of Trade Coordination supervisor—a position in which Beamon had been "interested" but had not formally applied. Beamon did not receive the promised 5% bonus at the end of 1999. In January 2000 he complained to Klomstad, who looked into the matter and reported that the delay had been caused by an e-mail miscommunication. Beamon received his 5% bonus on February 11, 2000.

In February Beamon once again requested a performance evaluation for the period left unreviewed by the departure of Joers. He was informed that a formal review for the prior period was not possible and that he would receive his next regularly scheduled review before the end of May 2000. Of the seven employees who did not receive reviews as a result of Joers' abrupt resignation, only one besides Beamon specifically requested a "make-up" review. This employee was also informed by Ewig that a review could not be accurately performed by any current M&I employees.

On March 2, 2000, Beamon's new supervisor, Dave Blader, asked Beamon whether he would be interested in a new position on the "Chase and Foreign Desk." Beamon was told that learning the functions of this job could lead to career advancement in the settlements area of the company. Beamon responded that he was not interested in the position unless it came with a $25,000 annual salary increase and an Assistant Vice President title. Blader was not receptive to these conditions and the matter was not pursued further.

On March 22, 2000, Beamon met with M&I's Equal Employment Opportunity supervisor, Suzanne Gawelski, and expressed his concern that his race may have factored into the foregoing management decisions regarding his employment. Gawelski investigated Beamon's concerns and determined that no racial discrimination had influenced any of the employment decisions. She did, however, conclude that Joers should have provided Beamon with a performance evaluation before leaving the company; she asked Klomstad and Ewig to evaluate Beamon's 1998-1999 performance. On April 24, 2000, they provided Beamon with a memorandum titled "1998/9 Performance Summary," the relevant portions of which stated:

> The principle [sic] reason for [Beamon's] reassignment was that [Joers] and the rest of the management group had lost confidence in [Beamon's] ability to effectively lead the Income processing group from its day-to-day performance problems to those of an acceptable level.
>
> . . . .
>
> [Beamon] was not viewed as having demonstrated the ability [n]or possessing the skills to lead the group through a period of substantial change that would require strong supervisory skills, depth of specific income processing industry knowledge, improved department organization, creative solutions, and stronger use of

> system tools. [Beamon] was viewed as an extremely dedicated and hard worker who may have been prematurely moved into a supervisory role as a brand new supervisor over an area for which he did not have a strong base of industry experience.

The memo also cited the $61,000 loss for which Ewig held Beamon responsible as the reason for the lack of an annual raise that year.

Beamon strongly disputed the accuracy of these criticisms. On May 10, 2000, he prepared a written response detailing his accomplishments during his tenure with the company; the state of the Income Processing Department at the time he arrived as supervisor; and his belief that it was his successor, Cashion, who was actually responsible for the $61,000 loss. Beamon demanded a retraction of the performance memorandum and retroactive compensation in the form of the pay raise that had been denied. Gawelski, Klomstad, and Ewig decided not to grant Beamon's demands nor make any formal response. Around this time Beamon also retained an attorney who wrote a letter to M&I officials laying out Beamon's complaints.

On June 21, 2000, after the letter from Beamon's attorney was received by M&I management, Gawelski arranged a meeting between Beamon and Dave Mauer, M&I's Assistant Director of Corporate Human Resources, hoping that Mauer could "convince Beamon to focus on moving forward in his career." At this meeting Mauer informed Beamon that he was a valued employee M&I wished to retain and he offered Beamon a raise. Beamon responded that he did not know what it would take for him to "move beyond" his current state of dissatisfaction, and he suggested that Mauer speak to his attorney. Mauer then asked Beamon whether he was "trying to stick it to M&I" and whether Beamon was interested in discussing a severance package. On June 27, 2000, six days after his meeting with Mauer,

Beamon filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that his removal as a supervisor in Income Processing was attributable to racial discrimination.

As of the date the district court record was closed, Beamon was still employed at M&I. Blader completed written evaluations of the work Beamon performed in 2000 and 2001, and in both instances Beamon received the same overall rating as the other employees Blader supervised—"meets expectations." Beamon received a 4% annual raise in 2001 and a 3% raise in 2002.

Beamon received a right-to-sue letter from the EEOC on March 29, 2001, and on August 22, 2001, commenced this suit alleging twelve separate claims of racial discrimination premised upon the actions described above. He also alleged that the facts gave rise to retaliation and hostile work environment claims. On M&I's motion for summary judgment, the district court held that six of the discrimination claims were barred by the statute of limitations and that Beamon had failed to establish a prima facie case with respect to the remaining discrimination claims. The court also dismissed the retaliation and the hostile work environment claims. Beamon appeals the judgment and also disputes several aspects of the district court's award of costs to M&I.

## II. Discussion

### A. Statute of Limitations

As applicable to this case, Title VII provides that a charge of racially discriminatory employment practices shall be filed with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII. *Martinez v.*

*United Auto., Aerospace & Agric. Implement Workers of Am.*, 772 F.2d 348, 350 (7th Cir. 1985). For purposes of this statute of limitations, discrete discriminatory employment actions such as termination, failure to promote, denial of a transfer, or refusal to hire are deemed to have been taken on the date they occurred, even if they form part of an ongoing practice or are connected with other acts. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-11 (2002). Thus, each discrete discriminatory act "starts a new clock for filing charges alleging that act," and charges not filed within 300 days of the act in question are not actionable. *Id.* at 113. In limited circumstances a plaintiff may invoke the doctrine of equitable tolling to pursue otherwise time-barred claims. *Chakonas v. City of Chicago*, 42 F.3d 1132, 1135 (7th Cir. 1994).

The district court dismissed Beamon's first six claims of discrimination because each constituted a discrete act that occurred more than 300 days prior to the filing of his EEOC charge and equitable tolling was not applicable. The six claims pertain to: (1) Beamon's removal from the supervisory position in the Income Processing Department (March 30, 1999); (2) his transfer to the booking area (March 30, 1999); (3) absence of a 1999 pay raise (July 1999); (4) his assignment to the Settlement Desk (July 1999); (5) absence of an annual performance review (July 1999); and (6) failure to promote Beamon to the Trade Coordinator supervisor position (August 16, 1999).

Beamon does not dispute that these six incidents occurred more than 300 days before he filed his EEOC charge. He argues that the statute of limitations was equitably tolled because prior to his receipt of the belated 1999 performance review in April 2000, he had no reason to suspect that race was motivating M&I's decisions and therefore was unaware of the existence of a possible Title VII claim. Beamon says that the possibility of racial discrimination only occurred to him when he read the performance review and discovered

that it "falsely" described him as prematurely having been moved into a supervisory position and "falsely" held him responsible for the $61,000 loss.

The Supreme Court has cautioned that equitable tolling in the context of Title VII is "to be applied sparingly." *Nat'l R.R.*, 536 U.S. at 113. The doctrine may extend the statute of limitations if, despite all due diligence, a plaintiff cannot obtain the information necessary to realize that he may possibly have a claim. *Chakonas*, 42 F.3d at 1135. Equitable tolling requires a court to consider whether a reasonable person in the plaintiff's position would have been aware of the *possibility* that he had suffered an adverse employment action because of illegal discrimination. *Id.*

Under this circuit's case law, a plaintiff awakens to the possibility of a Title VII claim far sooner than he achieves any level of certainty that his rights have been violated: "The qualification 'possible' is important. If a plaintiff were entitled to have all the time he needed to be *certain* his rights had been violated, the statute of limitations would never run—for even after judgment, there is no certainty." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) (emphasis in original). In *Jackson v. Rockford Housing Authority*, 213 F.3d 389 (7th Cir. 2000), an African-American plaintiff was passed over for a job promotion in favor of a white employee. In rejecting the plaintiff's claim that equitable tolling excused the lateness of his EEOC complaint, we held that the plaintiff knew when the white candidate was hired that "one possible explanation was racial discrimination" and he was therefore "required to undertake *some* inquiry to verify or discard this theory." *Id.* at 397 (emphasis in original).

We agree with the district court that a reasonable person familiar with the facts known to Beamon in 1999 would have been aware that racial discrimination could be "one possible explanation" for M&I's employment actions. Beamon was the only African-American manager at M&I

and was demoted in March 1999 without any articulated allegation of incompetence or unsuitability for the position. Moreover, Beamon was fully aware that he was replaced as Income Processing supervisor by a white employee and was passed over for the Trade Coordination supervisor position in favor of a white employee. At about the same time, Beamon failed to receive an annual raise.

Finally, and most tellingly, Beamon brought his complaints about these various employment actions to the attention of M&I's Equal Employment Opportunity supervisor before the expiration of the 300-day filing deadline. There are no grounds here for application of equitable tolling. Beamon's first six claims of discrimination were properly dismissed.

### B. Prima Facie Case of Discrimination and Retaliation

Beamon's remaining claims of discrimination and retaliation are premised on the following actions by M&I management: (1) "false" performance reviews for 1999, 2000, and 2001; (2) insufficient mentoring; and (3) permanently "capping" his career with M&I at a nonmanagerial level.[1] The district court dismissed these claims on summary judgment, holding that Beamon had not established a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Beamon has no direct evidence of discrimination or retaliation. The *McDonnell Douglas* indirect method of proof requires Beamon to show that: (1) he belongs to a protected class, (2) he performed his job satisfactorily, (3) he suffered

---

[1] In the district court Beamon also claimed that M&I's payment of his 1999 bonus a month late constituted racial discrimination, but he has not appealed that aspect of the district court's decision.

a materially adverse employment action, and (4) his employer treated similarly situated employees outside the protected class more favorably. *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir. 1994). The elements of a prima facie case of retaliation are only slightly different: (1) the plaintiff engaged in statutorily protected activity, (2) he performed his job according to the employer's legitimate expectations, (3) he suffered a materially adverse employment action, and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). Beamon's prima facie case is extremely weak and, indeed, nonexistent on at least one element common to both discrimination and retaliation claims: he has failed to produce any evidence that similarly situated white employees were treated more favorably than he.

As to Beamon's claim that he received "false" performance reviews, we note first that although negative performance evaluations may be evidence of discrimination, they are not alone considered to be actionable adverse employment actions. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). Moreover, there is no evidence that M&I treated similarly situated white employees more favorably. Regarding his "false" 1999 performance review, Beamon identifies Mark Cashion, his replacement as the supervisor in Income Processing, as a similarly situated, non-African-American employee. But Beamon offers no evidence that Cashion received an accurate and fair performance evaluation while he did not; rather, he argues that Cashion performed poorly as the supervisor in Income Processing but, unlike Beamon, was not demoted. This line of argument may have had traction on Beamon's time-barred claim regarding the removal of his supervisory duties, but it has no relevance to his contention that his "false" 1999 performance review is evidence of discrimination. Perhaps

Cashion's review (if he received one) was inaccurately laudatory. It may have been fair and balanced. Perhaps it was unfairly critical or deliberately inaccurate. We have no way of knowing because Beamon has made no attempt to compare M&I's handling of his performance review to Cashion's—or any other employee's, for that matter.

The same analysis applies to Beamon's claims that racial discrimination and retaliation were to blame for "false" performance evaluations in 2000 and 2001. In support of these claims, Beamon argues only that the supervisor responsible for these evaluations, Dave Blader, told Beamon that "the powers that be" had offered unspecified "negative input" into these evaluations, which were thereby rendered "inherently unfair." This assertion does not function as evidence that similarly situated white employees received more favorable treatment in connection with their performance reviews for the years 2000 and 2001. As far as the record discloses, Blader gave identical "meets expectations" ratings to all of the employees he supervised. Beamon's claims of racial discrimination and retaliation in connection with his 1999-2001 performance reviews were properly dismissed.

To the extent that Beamon's discrimination and retaliation claims were premised upon a lack of sufficient mentoring, the district court held that Beamon failed to identify any evidence demonstrating that similarly situated white employees received greater or more meaningful mentoring. On appeal Beamon virtually disregards the basis for the district court's holding and makes a one-sentence assertion, without citation to record evidence, that Cashion received some unspecified form of mentoring and he did not. This is an insufficient basis upon which to reverse the summary judgment. Such unsupported and undeveloped arguments are waived. *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005).

Beamon's final claim of discrimination/retaliation pertains to his contention that M&I management has tacitly "capped his career" at the nonsupervisory level. Even under the best factual conditions this claim would be extremely difficult to establish because it assumes a future state of affairs that may or may not occur. If we understand the claim correctly, Beamon is suggesting that current management has decided that he may never again be entrusted with managerial responsibilities and that the impetus for this decision was his race and not his suitability for positions that may or may not become available in the future. As with his other claims, Beamon has attempted to establish a prima facie case using a scattershot approach that does not come close to meeting the burden imposed by the *McDonnell Douglas* framework.

Beamon identifies some evidence that, when viewed in the light most favorable to him, suggests that certain managers at M&I took a dim view of his immediate prospects as potential "vice president material." Beamon cites this as evidence of hostility toward his advancement borne of racial animus, but he makes no attempt to meaningfully compare his situation with that of any similarly situated, non-African-American employee or any employee who did not lodge complaints under Title VII. The record is silent regarding the fates of Tami Hagen and Connie Douglas, the two white employees who were also demoted as part of the reorganization of Trust Operations. Have they been promoted up through the supervisory ranks while Beamon stayed behind? As we have noted, M&I's placement of Cashion in the Income Processing supervisor's job was actually a step backward in his advancement within the company. Beamon has failed to establish a prima facie case that his career development was "capped" due to discrimination on the basis of race or in retaliation for raising complaints of discrimination.

### C. Hostile Work Environment

An employer may be liable for discrimination within the meaning of Title VII if an employee is subjected to a hostile work environment based on his race. To survive summary judgment on a hostile work environment claim, Beamon was required to establish that: (1) he was subjected to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). The district court held that Beamon failed to come forward with evidence sufficient to establish several elements of this test, but we find one omission particularly glaring and sufficient to affirm the judgment: even assuming Beamon's various complaints about his career progression can be character-ized as "harrassment" (and we are skeptical), there is no evidence that any of M&I's actions were motivated by Beamon's race.

The record is devoid of any indication that M&I's em-ployment decisions were "inherently racial," that they evidenced "negative attitudes toward African-Americans," or that they had "racial . . overtones." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345-46 (7th Cir. 1999). While it is true that harassment need not be *explicitly* racial in order to be probative of a hostile environment, *id.* at 345, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motiva-tion merely because the complaining employee belongs to a racial minority. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir. 1989). Rather, we have held that the alleged harassment must be "sufficiently connected to race" before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race. *Luckie*, 389 F.3d at 713; *Shanoff v. Ill. Dep't of Human Serv.*, 258 F.3d 696, 704 (7th Cir. 2001).

Beamon has identified no evidence of a connection between the unfair treatment he claims to have received at the hands of M&I management and the fact that he is African-American. There is no inherently racial component to an employer providing an employee with a critical (even an unfairly critical) performance review, providing an employee with insufficient mentoring, or determining that an employee does not yet have what it takes to be elevated to a managerial position. Beamon asserts that racial hostility was the impetus underlying each of these actions by M&I, but his sole basis for doing so is the fact that he is African-American. The "harrassment" of which Beamon complains could just as readily have been perpetrated upon a white person without any alteration in its character or purpose. Accordingly, we cannot reasonably construe M&I's actions as being motivated by hostility to Beamon's race. The district court rightly concluded that Beamon failed to present evidence sufficient to survive summary judgment on his hostile work environment claim.

### D.  Taxation of Costs

M&I filed a bill of costs requesting $3,804 for deposition transcripts and court reporter fees and $6,176 for photocopying. The clerk of courts taxed the requested costs in M&I's favor. There is a presumption that the prevailing party will recover costs, and the losing party bears the burden of an affirmative showing that taxed costs are not appropriate. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991). A district court's award of costs will not be overturned in the absence of a clear abuse of discretion. *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997).

Beamon objects to over $4,000 in copying expenses and approximately $1,890 in costs associated with the videotaping of his deposition. He argues that the photocopying was

excessive and "merely for the convenience of [M&I's] attorneys" so they could set up "a 'make-shift' M&I office" at their law firm. He also argues that his deposition was videotaped merely for M&I's "already established largesse." This is hyperbole, not legal argument. We have reviewed the record and find no clear abuse of discretion. The costs taxed by the district court were reasonable and necessary for the defense of the action.

The judgment of the district court is AFFIRMED.


A true Copy:

Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*