In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-3693 & 19-1439

RONALD CROSBY,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-4094 — **Virginia M. Kendall**, *Judge.*

_____

ARGUED DECEMBER 10, 2019 — DECIDED FEBRUARY 5, 2020

_____

Before KANNE, SYKES, and BARRETT, *Circuit Judges.*

BARRETT, *Circuit Judge.* This case is about the scope of a release in a settlement agreement. In 2015, Ronald Crosby settled a lawsuit against Eduardo Gonzalez, a Chicago police officer who allegedly shoved Crosby out of a third-floor window before arresting him. In the settlement stipulation, Crosby released "all claims he had, has, or may have in the future … arising either directly or indirectly out of the incident" against Gonzalez, the City of Chicago, and all future,

current, or former City officers. Crosby insists that this release does not bar his new suit against the City and its officers for torts they committed in the course of covering up Gonzalez's misconduct. We disagree.

## I.

In 2010, Ronald Crosby plummeted three stories from a window before Eduardo Gonzalez, a Chicago police officer, arrested him. Crosby maintains that Gonzalez intentionally pushed him through the window and then tried to justify his actions by falsely claiming—with corroboration from other officers who were present—that Crosby possessed a gun during the arrest. This alleged lie had grave consequences for Crosby: he was charged under the Illinois armed career criminal statute, convicted by a jury, and sentenced to eight years in prison. His conviction was reversed in 2014 by an Illinois intermediate appellate court and again by the same court in 2016 after the Supreme Court of Illinois vacated the first reversal.

Between the initial reversal of his conviction and the Illinois Supreme Court's order vacating that reversal, Crosby initiated a pro se lawsuit under 42 U.S.C. § 1983 against the arresting officers, alleging excessive force and an attempted coverup. Crosby was appointed counsel, who filed an amended complaint naming only Gonzalez and suing only for excessive force and improper entry. The parties settled, and the district court dismissed Gonzalez's claims with prejudice in May 2015.

The settlement agreement was between Crosby, Gonzalez, and "Defendant, City of Chicago," though the latter had not

been named as a defendant in the complaint. It provided that Crosby would receive $5,000 in exchange for releasing

> all claims he had or has against the individual Defendant, Eduardo Gonzalez, and the City of Chicago, and its future, current or former officers … , including but not limited to all claims he had, has, or may have in the future, under local, state, or federal law, arising either directly or indirectly out of the incident which was the basis of this litigation, and that such release and discharge also is applicable to any and all unnamed and/or unserved defendants.

The contract also stipulated that Crosby's attorney "interpreted, completely read and explained" its contents to Crosby, that it was governed by Illinois law, and that it was not to be "construed against a party merely because that party is or was the principal drafter." Crosby, his attorney, and the City's attorneys signed the agreement.

Three years after Crosby entered this settlement, he filed another suit, this one against the City, Gonzalez, and the officers who backed up Gonzalez's story. He did not rehash his claim for Gonzalez's use of excessive force; instead, he focused on the officers' alleged lie that he possessed a gun during the arrest. Crosby characterized this as a fabrication designed to cover up Gonzalez's misconduct, and as a result of this lie, he said, he was unlawfully detained before trial, maliciously prosecuted, and wrongfully convicted and imprisoned.

The defendants argued that Crosby's release of "all possible claims that arise directly or indirectly from the 'incident'"

plainly encompassed his claims regarding the defendants' coverup of Gonzalez's misconduct. The district court agreed and entered judgment against Crosby; in a separate order, it dealt with the parties' dispute over costs.[1] While it rejected some of the City's claimed costs on the ground that they involved nonessential copying, it awarded the City $2,131.60 for the printing of transcripts of Crosby's state-court criminal proceedings. The City reasonably printed the transcripts, the district court concluded, because Crosby's state-court proceedings were relevant to this litigation. Crosby appeals both the judgment against him and the district court's award of costs to the City.

## II.

Crosby acknowledges that the agreement releases "all claims he had, has, or may have in the future … arising either directly or indirectly out of the incident which was the basis of this litigation." But he insists that this language is not as broad as it appears. He points out that the first four paragraphs of the agreement refer to his complaint against Gonzalez; for example, the third paragraph states that "settlement of *these claims* is not an admission of liability … ." According to Crosby, these specific references narrow the scope of the general release that appears later in the contract, indicating that the claims that he asserted in his first suit—the ones against Gonzalez for excessive force—are the only ones encompassed by the release.

---

[1] The district court also accepted the defendants' alternative argument that Crosby's claims were precluded by res judicata. Because we affirm on the basis of the settlement agreement, we don't address this alternative ground.

Crosby invokes Illinois law, which governs the construction of the contract, to support his position. In *Gladinus v. Laughlin*, the front of a check from an insurance company was coded for property damage to a car, and the check was for the exact amount of damage to the plaintiff's vehicle. Even though the back of the check noted that by endorsing the check, "the payee/s agree/s to release and discharge all claims against [the insurance company]," the court held that the front of the check established "the understanding of all concerned parties that the release affected her claim for property damage only and not her action for personal injuries." 366 N.E.2d 430, 431–33 (Ill. App. Ct. 1977). Similarly, in *Chicago Transit Authority v. Yellow Cab Co.*, the plaintiff had signed a release containing a four-digit code that referred exclusively to a property damage claim, the settlement was for the exact amount of damage done to the bus involved in the accident, and affidavits of the plaintiff's claims adjusters stated that they contemplated releasing only the claim for property damage. Given this evidence, the court held that the release did not include claims for personal injuries arising from the accident despite broader language in the release. 463 N.E.2d 738, 741 (Ill. App. Ct. 1984).

Crosby argues that these cases establish a rule that an agreement's reference to a specific claim always limits an otherwise general release to only the claim mentioned. That position reflects a significant misunderstanding of these cases. Under Illinois law, "the intention of the parties controls the scope and effect of the release; such intent is determined from the language of the instrument when read in light of the circumstances surrounding the transaction." *Gladinus*, 366 N.E.2d at 696. *Gladinus* and *Chicago Transit Authority* simply apply that rule, holding that the language of the relevant

contracts—which were coded for property damage with settlement amounts to match—reflected the parties' intent to release only claims for property damage.

The contract between Crosby, Gonzalez, and the City is markedly different from those at issue in *Gladinus* and *Chicago Transit Authority*. The latter contracts contained very specific indicia of the parties' intent to restrict ostensibly broad language; the references to the underlying suit in Crosby's settlement agreement are not analogous. It would have been odd for the settlement *not* to mention the underlying suit that prompted it; the desire to dispose of those claims is what drove the parties to the bargaining table. But the contract makes plain that in exchange for the settlement money, Crosby agreed to do more than dismiss his existing suit with prejudice: he also agreed to release the City, Gonzalez, and its officers from liability for "all claims he had, has, or may have in the future … arising either directly or indirectly out of the incident which was the basis of this litigation." The agreement was designed to resolve *all* claims related to the incident, not only the ones that Crosby asserted in his first suit.

Crosby offers another reason why we should construe the scope-of-release clause narrowly. The clause releases claims "arising either directly or indirectly out of *the incident which was the basis of this litigation*." As Crosby sees it, the "incident" to which the contract refers is Gonzalez's act of pushing him through the window; the alleged coverup is a distinct incident that the agreement does not reach. Thus, he maintains, the release bars additional claims related to the use of excessive force, not claims stemming from his pretrial confinement, conviction, and imprisonment.

We rejected this very argument in *Cannon v. Burge*, which involved a similar release. 752 F.3d 1079 (7th Cir. 2014). In *Cannon*, the plaintiff sued Chicago police officers who tortured him to extract a confession of a crime for which he was ultimately convicted and imprisoned. He settled the suit for a modest sum in a contract that released not only the claims asserted against the defendant officers, but also "all claims he has, or may have in the future, arising either directly or indirectly out of the incident which was the basis of this litigation." *Id.* at 1083. Years later, the plaintiff sued the City and various employees for, among other things, malicious prosecution, deprivation of a fair trial, and false imprisonment. To escape the release, the plaintiff "attempt[ed] to carve out his claims for wrongful conviction and malicious prosecution as separate and distinct incidents not covered by the settlement." We rebuffed that attempt, observing that it "ignore[d] … the 'arising from' language in the 1988 Stipulation." *Id.* at 1092.

The same reasoning controls here. Crosby released all claims "*arising either directly or indirectly* out of the incident." Even if "the incident" refers to Crosby's fall through the window rather than the arrest as a whole, Crosby's claims regarding the coverup plainly "aris[e] from" the incident that was being covered up. As in *Cannon*, the language of the release plainly encompasses his claims for wrongs committed after his arrest; it forecloses his attempt to carve those claims out.

*Cannon* dispenses with Crosby's next argument too. Crosby maintains that he did not release his claims for injuries caused by the coverup because they "did not exist" when he signed the settlement agreement. He could not assert his state-law claim for malicious prosecution until his conviction

was vacated, *see Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1350 (Ill. 1997), his federal claim for unlawful pretrial detention until he was released, *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018), or his federal claim for unlawful conviction until he obtained a favorable disposition, *see Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). These were "future" claims, Crosby says, and Illinois disfavors the release of claims that have not accrued at the time the agreement is entered.

But as we explained in *Cannon*, what matters under Illinois law is whether the parties could foresee these claims, not whether they had accrued at the time of the settlement. Like Crosby, the plaintiff in *Cannon* "had already been wrongfully convicted as a result of what he assert[ed] to be a malicious prosecution"; we noted that the fact "[t]hat he could not bring these claims until his conviction was set aside is irrelevant to the clear language of the … Stipulation." *Cannon*, 752 F.3d at 1092. The relevant question is whether these claims were within the contemplation of the parties. *See Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991) ("[W]here both parties were aware of an additional claim at the time of signing the release, courts have given effect to the general release language of the agreement to release that claim as well."); *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984) (noting that the plaintiff "knew when he executed the release" that the defendant "may have contributed to the accident"). And harms that arose from the same incident that was the subject of the *Cannon* plaintiff's first suit—indeed, harms that he had already suffered at the time he signed the release— were necessarily within the contemplation of the parties.

Crosby is similarly situated to the plaintiff in *Cannon*: he was well aware that he might have claims for malicious prosecution, unlawful detention, and unlawful conviction at the time he signed the release. In fact, he appeared to assert some of these claims in the first complaint that he filed in the original suit, *see* Complaint at 2–3, *Crosby v. Gonzalez*, No. 12-cv-5622 (N.D. Ill. July 17, 2012), even though his amended complaint dropped them. Moreover, the Illinois intermediate appellate court had reversed his conviction more than a year before he signed the settlement agreement, so he knew at that point that bringing these claims was a very real—perhaps imminent—possibility.[2] *See People v. Crosby*, 2014 IL App (1st) 121645-U, *vacated*, 60 N.E.3d 75 (Ill. 2016).

Still bucking *Cannon*, Crosby insists that a plaintiff's release of future claims is unenforceable. But again, the relevant question is whether the claims were within the contemplation of the parties. Illinois does not prohibit the release of foreseeable claims; it prohibits the blanket release of claims that are "not within the contemplation of the parties." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89 (Ill. 2003). And as we have already explained, claims related to Crosby's detention and prosecution were plainly foreseeable to the City, Gonzalez, and Crosby himself.

But, Crosby protests, Illinois requires a "clear expression" of intent to extinguish future claims, *see Chubb v. Amax Coal Co.*, 466 N.E.2d 369, 372 (Ill. App. Ct. 1984), and his release is

---

[2] While the Illinois Supreme Court vacated the appellate court's judgment, it did so in 2016, and Crosby signed the release in 2015. Crosby then prevailed in the appellate court on remand; it reversed his conviction for a second time in 2017.

"inconsistent" and "ambiguous." It "illogically" discharges "all claims he had [or] has" against the City and its officers, "including but not limited to all claims that he had, has, or may have in the future." How, Crosby asks, can future claims be included in claims that one "had or has?"

We will put aside Crosby's characterization of his post-arrest claims as "future" claims. As we have already explained, the relevant question is whether the claims were within the contemplation of the parties, not whether they had accrued. Regardless, Crosby's effort to gin up ambiguity is unavailing. The phrase is plainly designed to encompass any past, present, or future claims arising out of the incident that was the subject of his first suit. Illinois courts "will not strain to find an ambiguity where none exists," so neither will we. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). Crosby is bound by the terms to which he agreed, even if he regrets them now.

## III.

There is one final matter: costs. Crosby argues that the district court should not have permitted the City to recover the costs that it incurred in procuring court transcripts of Crosby's state criminal proceedings. According to Crosby, Federal Rule of Civil Procedure 54 places the burden on the defendants to show the reasonableness of their requested costs. And, as he sees it, the City failed to carry that burden.

Crosby has it backwards. The City did not bear the burden of showing that the costs were reasonable; Crosby bore the burden of showing that the costs were unreasonable. We have made very clear that "[t]he losing party has the burden to affirmatively show that the prevailing party is not entitled to

costs." *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991); *see also Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 864 (7th Cir. 2005) ("There is a presumption that the prevailing party will recover costs, and the losing party bears the burden of an affirmative showing that taxed costs are not appropriate.") This "presumption in favor of awarding costs to the prevailing party is difficult to overcome, and … the court must award costs unless it states good reasons for denying them." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997). We will not disturb a district court's award of costs unless it clearly abused its discretion. *Beamon*, 411 F.3d at 864. Crosby has done nothing to show that the City's requested costs were unreasonable, much less that the district court abused its discretion in granting the City's request.

* * *

The district court's judgment and award of costs are AFFIRMED.