In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1529

DARRELL CANNON,

*Plaintiff-Appellant*,

*v.*

JON BURGE, former Chicago Police
Lieutenant, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:05-CV-02192 — **Amy St. Eve**, *Judge.*

ARGUED JANUARY 22, 2013 — DECIDED MAY 27, 2014

Before RIPPLE, ROVNER, *Circuit Judges*, and BARKER, *District Judge.*[*]

ROVNER, *Circuit Judge.* This appeal casts a harsh light on some of the darkest corners of life in Chicago. The plaintiff, at

---

[*] The Honorable Sarah Evans Barker, of the United States District Court for the Southern District of Indiana, sitting by designation.

the time of the events giving rise to this suit, was a general in the El Rukn street gang, out on parole for a murder conviction, when he became embroiled in a second murder. Among the defendants are several disgraced police officers, including the infamous Jon Burge, a man whose name evokes shame and disgust in the City of Chicago.[1] At issue is whether the plaintiff, who long ago settled his claims against the defendants, should be allowed to have a second chance to litigate his case, on the grounds that the defendants engaged in such an extensive cover-up of the police torture scandal at the center of this case that the plaintiff was effectively denied his day in court the first time around. The district court held that the settlement precluded further litigation and granted summary judgment in favor of the defendants. We affirm.

## I.

In 1971, Darrell Cannon, the plaintiff here, was convicted of the murder of Emanuel Lazar and was sentenced to 100 to 200

---

[1] In a career spanning more than twenty years, Jon Burge rose to the rank of Commander in the Chicago Police Department before he was fired in 1993 for torturing and abusing suspects in order to obtain confessions. More than one hundred African-American arrestees accused Burge and officers working under him of engaging in sadistic acts. Burge was later prosecuted and convicted on charges of obstruction of justice and perjury related to lies he told during lawsuits for civil damages. He is currently serving a fifty-four month sentence in a federal penitentiary. *See United States v. Burge*, 711 F.3d 803 (7th Cir.), *cert. denied*, 134 S. Ct. 315 (2013); Press Release, U.S. Department of Justice, Former Chicago Police Officer Jon Burge Sentenced for Lying About Police Torture (Jan. 21, 2011) (available at http://www.justice.gov/opa/pr/2011/January/11-crt-090.html (last visited May 23, 2014)).

years in prison. After serving twelve years of that sentence, Cannon was paroled in January 1983. Approximately ten months later, on October 26, 1983, Cannon found himself behind the wheel of a car, traveling down the Bishop Ford Freeway[2] in Chicago, as one of his fellow El Rukn generals, Andrew McChristian, murdered Darrin Ross in the back seat. Cannon then followed McChristian's directions to take the next exit off the freeway, driving to a field behind the Altgeld Gardens housing complex. There, McChristian and Cannon dumped Ross's body onto the side of a dirt road adjoining the field. Not knowing whether Ross was dead or alive, Cannon then drove McChristian to a pool hall where Cannon picked up his own car and drove home.

A few days later, on November 2, 1983, Cannon was arrested for Ross's murder by three of the defendants in this case, Sergeant John Byrne and Detectives Peter Dignan and Charles Grunhard. These men worked for the Chicago Police Department's Area 2 Violent Crimes division under two other defendants in this case, then-Commander Leroy Martin and then-Lieutenant Jon Burge. Together with police detectives Michael Bosco and Daniel McWeeny, Byrne, Dignan and Grunhard threatened and tortured Cannon until he confessed that he knowingly[3] participated in the murder of Darrin Ross.

---

[2]  At the time of the murder, this stretch of highway was known as the Calumet Expressway. It was renamed the Bishop Ford Highway in 1996. In his 2010 deposition, Cannon referred to the road as "the Bishop Ford."

[3]  Cannon concedes that he was driving the car in which the murder was carried out but contends that he did not know that McChristian was going

(continued...)

All of this was accompanied by race-based taunts and threats. Each time Cannon thought he was safely away from his tormentors, he recanted his confession, and each time he recanted, he was subjected to more torture.

Almost immediately after leaving police custody, Cannon recanted his confession again and began to complain about the treatment he received at the hands of these officers. Five days after his arrest, his wife filed a complaint on his behalf with the Chicago Police Department's Office of Professional Standards ("OPS"). But Byrne, Dignan and Grunhard lied to OPS, and the complaint was dismissed as "not sustained." At his criminal trial in 1984, Cannon moved to suppress his confession on the grounds that it was obtained through torture and coercion. Again Byrne, Dignan and Grunhard as well as McWeeny lied, this time under oath, denying that Cannon had been tortured. The court denied the motion to suppress and Cannon's confession was used at trial. In 1984, Cannon was convicted of Darrin Ross's murder and sentenced to life in prison.

In September 1986, two years after his conviction, Cannon filed a *pro se* federal complaint from prison, asserting for a third time that Byrne, Dignan and Grunhard had mistreated him. In particular, he alleged that Dignan beat him on the knee with a flashlight; that Dignan played "Russian Roulette" with him with an apparently loaded shotgun, repeatedly placing the barrel in Cannon's mouth and pulling the trigger when Cannon refused to answer questions; that Grunhard, Dignan

---

[3] (...continued)
to murder Ross. He explains that his actions following the murder were due to shock at what had just occurred.

and Byrne lifted him up from behind by his handcuffs, causing unbearable pain; and that Byrne pulled down Cannon's pants and shorts and applied an electric cattle prod to his testicles, penis and the inside of his mouth repeatedly over an hour-long period as the officers questioned Cannon about Ross's murder. Cannon sought from each officer "$15,000 in compensatory and punitive damages, plus physical injuries, pain, suffering, emotional and mental distress" as well as other relief the court deemed just and proper. R. 28-2, at 42-48. The court appointed attorney E. Paul Lanphier to represent Cannon. Lanphier deposed Byrne, Dignan, Grunhard and McWeeny and all four continued to lie under oath and deny that they had abused Cannon. Both Cannon and Lanphier suspected that Cannon was not the only arrestee who had been abused by these officers – indeed, there had been some news reports of other incidents—but they did not know that the abuse against African American men by Area 2 officers was pervasive and occurred with the complicity of Burge. They did not know that many of the same bizarre and sadistic techniques that these officers used against Cannon had also been used against many other African American men who had been arrested in Area 2. Despite their suspicions, Lanphier did not ask the City or the individual defendants about any other victims of the Area 2 officers.

In 1988, Lanphier assessed Cannon's case in light of the facts known to him at the time: Cannon was now a twice-convicted murderer, a long-time gang member, sentenced to life in prison, accusing his arresting officers of torture. Although Lanphier believed that the second murder conviction would be inadmissible at the civil trial, he advised Cannon that

the first murder conviction would be considered relevant and admissible. There was no physical evidence to corroborate Cannon's claims and the officers had repeatedly denied the allegations, including under penalty of perjury. Lanphier assessed Cannon's chances of prevailing as slim and advised Cannon to settle for the $3000 nuisance value offered by the defendants. R. 391-7, at 2-4, 6. Cannon accepted his lawyer's advice and settled the suit in February 1988, signing a broadly worded release of his claims against the named defendants as well as the City of Chicago, which was joined for the purpose of settling the case:

> In consideration of the hereinafter-indicated settlement and Judgment entered thereon, Plaintiff agrees to indemnify and hold harmless the City of Chicago, its officers, agents and employees including, but not limited to, the remaining Defendant, from any claims, losses, damages or expenses incurred, or which may be incurred, by reason of the incident which was the basis of the litigation.

…

> Plaintiff understands, upon advice of his counsel, and agrees that such Judgment is a final and total settlement of all claims he has, or may have in the future, arising either directly or indirectly out of the incident which was the basis of this litigation, and that such finality is applicable to the remaining Defendant, the CITY OF CHICAGO, its officers, agents and employees.

R. 28-2, at 38-39 (hereafter, the "1988 Stipulation"). After costs and fees, Cannon netted $1247.70. The case against the officers was dismissed with prejudice, and final judgment was entered in favor of Cannon and against the City of Chicago. The 1988 Stipulation was incorporated by reference into the judgment order. R. 28-2, at 37-40; 50-51.

In the meantime, Cannon appealed his conviction. The Illinois appellate court affirmed the denial of his motion to suppress his confession but remanded the case to the trial court for a hearing on the prosecution's use of peremptory chal-lenges to exclude African American jurors. After holding that hearing, the trial court ordered a new trial. *People v. Cannon*, 688 N.E.2d 693, 693-94 (Ill. App. 1st Dist. 1997) ("*Cannon I*"). At the subsequent retrial in 1994, the court declined to revisit the issue of the voluntariness of Cannon's confession and once again allowed the confession to be used as evidence. Cannon was again found guilty of the murder of Darrin Ross, and again sentenced to life in prison.

Cannon appealed again and, this time, the court vacated the conviction and the sentence, and remanded for a new hearing on the voluntariness of Cannon's confession. *Cannon I*, 688 N.E.2d at 694. The court noted that Cannon had presented the trial court with new evidence in support of his motion to reconsider the ruling from the first trial. In particular, Cannon wished to present (1) a police log indicating that his arresting officers had checked out a shotgun on the day of his arrest, contrary to their testimony at his first suppression hearing that they were not in possession of a shotgun; (2) deposition testimony from Byrne and Dignan in a related civil action; (3) photos taken by OPS of the site where Cannon said he was

tortured; (4) testimony of sixteen arrestees who filed charges with OPS that they had been tortured by some of the same officers at Area 2; and (5) evidence that cattle prods small enough to fit in a car's glove compartment existed in 1983. Cannon also supported his motion with an offer of proof stating that the defense, if allowed, would have presented the testimony of eleven other men who had been mistreated by some of the same officers who tortured Cannon. *Cannon I*, 688 N.E.2d at 694-96.

The court concluded that ordinary principles of collateral estoppel should not bar re-litigation of Cannon's motion to suppress because this was no ordinary case. First, the judge who originally ruled on Cannon's motion to suppress in his first trial was Thomas Maloney, himself an ignominious figure in Chicago politics who was later convicted of accepting bribes to fix murder cases during the same time period as Cannon's original trial. *See Bracy v. Gramley*, 520 U.S. 899 (1997). Second, Cannon was now prepared to present evidence that the officers who procured his confession regularly used torture to coerce confessions. And third, Cannon had new evidence of coercion that was not available at his 1984 trial. The court found that new evidence and "special circumstances" were well-recognized exceptions to the general rule barring re-litigation of a decided motion, and that both exceptions were relevant in Cannon's case. The court surveyed the evidence that warranted application of the exceptions:

> Reports prepared by the Office of Professional Standards of the Chicago Police Department, surveying the alleged systematic abuse of suspects at

> Area 2 headquarters, were not available to Cannon's lawyer in 1984.
>
> Nothing in the record demonstrates that Cannon's lawyer knew or should have known of the claims of brutality made by other suspects questioned at Area 2. In addition, newly discovered or not, the evidence of 28 other Area 2 arrestees, 16 of them questioned by some of the officers who questioned Cannon, amount to "special circumstances" that justify a new hearing of the motion to suppress.

*Cannon I*, 688 N.E.2d at 697 (internal citation omitted). In December 1997, the appellate court therefore remanded the case for a new suppression hearing that included the new evidence Cannon wished to present.

In January 2001, after the trial court held a hearing on Cannon's renewed motion to suppress but before the court ruled on that motion, Cannon agreed to plead guilty to the lesser charges of armed violence and conspiracy to commit murder, in exchange for a total sentence of forty years' imprisonment. Cannon stipulated that the witnesses who were called to testify in the second trial would testify consistently at any future trial, and that assistant state's attorney Henry Simmons, who took handwritten notes of Cannon's confession in 1983, would testify in conformance with his prior testimony. Without admitting guilt, Cannon agreed that the evidence presented at the prior trial and the statement recorded by Simmons would be sufficient to constitute proof of guilt of the charges of armed violence and conspiracy to commit murder. *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970) ("An individ-

ual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime. Nor can we perceive any material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when … a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt."). With full credit for the time Cannon had already served, the parties agreed that he would be eligible for release in August 2003.

At some point, it became apparent to Cannon that, irrespective of his plea agreement with the State, the Illinois Prisoner Review Board (hereafter "IPRB" or the "Board") had concluded that Cannon was not eligible for release until July 2064, some sixty-one years beyond the date agreed to in his plea. As we noted above, at the time he was arrested for Ross's murder, Cannon was on parole for the 1971 murder of Emanuel Lazar, and had served only twelve years of his 100 to 200 year sentence for that crime. Following his conviction for Ross's murder, in August 1984 Cannon was retroactively declared in violation of his parole in the Lazar case, and his parole was revoked as of his November 2, 1983 arrest date. In February 2003, the IPRB held a hearing at which the Board was advised of the terms of Cannon's plea agreement with the State. The State did not oppose Cannon's parole at that hearing. The IPRB nonetheless refused to release Cannon on parole, and gave no assurances that he would be released prior to July 2064. The IPRB continued Cannon's case for another parole hearing in 2006.

Unsatisfied with that result, in October 2003, Cannon moved in post-conviction proceedings to vacate his plea, contending that he had received ineffective assistance of counsel because his lawyers had not investigated the effect of the plea on the 1984 retroactive revocation of his parole. He also contended that the State had failed to adhere to its side of the plea bargain, and that the plea could not be considered knowing, voluntary and intelligent under the circumstances. In an April 2004 filing, the State agreed that Cannon had received ineffective assistance when his lawyers failed to investigate the effect of the plea on his parole, and agreed that the plea should be vacated. The State conceded that it too assumed that Cannon would be released in August 2003, but now agreed that any guilty plea in the 1983 case would support revocation of parole in the 1971 case. In order to honor the understanding of the parties at the time of the plea, the State therefore agreed to dismiss the substantive case against Cannon. The State emphasized that it dismissed the Ross murder charges solely to rectify the procedural problem created when neither side anticipated the effect of the plea agreement on Cannon's parole status for the 1971 conviction. The State continued to assert that Cannon was factually guilty of the charges to which he pled in 2001.

In June 2004, Cannon received a full parole revocation hearing before the IPRB. The Board again concluded that Cannon violated his parole in the 1971 case by committing the crime of murder in 1983. The Board stated that it analyzed the evidence without giving any consideration to Cannon's coerced statement to the Area 2 officers except for portions of the statement that Cannon admitted in motions and at trial.

The Board first considered Cannon's accountability using the 1983 grand jury testimony of Tyrone McChristian, the brother of Andrew McChristian, as well as Cannon's own sworn testimony.[4] In grand jury proceedings, Tyrone testified that Cannon and McChristian were both "generals" in the El Rukn street gang, that Ross had stolen drug money, that Cannon was intent on carrying out McChristian's plan to seek revenge on Ross, and that Cannon retrieved a gun for McChristian and then drove the car so that McChristian could shoot Ross. The Board found that Cannon's proximity to the murder and his subsequent actions in aiding McChristian to dispose of Ross's body led to only one conclusion: that Cannon was accountable for the murder of Ross, that Cannon voluntarily attached himself to McChristian's plan and that Cannon shared McChristian's intent.

The Board then considered Cannon's accountability based solely on his own testimony, again excluding his coerced statement except to the extent it was admitted by Cannon's other testimony. According to Cannon's own account of Ross's murder, on October 26, 1983, Cannon met Tyrone at a pool hall. Tyrone told Cannon that McChristian wanted to meet him at his girlfriend's house. Tyrone drove Cannon to the house of McChristian's girlfriend, where McChristian and Ross were waiting. McChristian told Cannon that he was meeting some people and wanted Cannon to "watch his back." Cannon, McChristian and Ross then all took a ride in McChristian's car. With Cannon driving, McChristian and Ross argued about

---

[4]   We will refer to Tyrone McChristian as "Tyrone" and to Andrew McChristian as "McChristian."

drugs and a robbery. McChristian then brandished a revolver and shot Ross twice in the head. A second round of gunfire ensued. Either Cannon or McChristian retrieved a towel from the trunk to contain the blood from the victim's head. Cannon and McChristian then drove to a prairie behind the Altgeld Gardens housing complex and dumped Ross's body in the prairie. Based on this account, the IPRB rejected Cannon's claims that he did not see the gun, that he did not know that McChristian, his friend of nineteen years, had a gun, and that he did not know that McChristian was about to kill Ross. The Board found Cannon's actions following the murder to be indicative of consciousness of guilt. In particular, Cannon tried to keep Ross's blood from staining the car, helped dispose of the body, left the scene, failed to notify the police, and failed to dissociate himself from McChristian during or after the crime. The Board, therefore, again revoked Cannon's parole.

Cannon then brought suit in state chancery court against the IPRB, asking for immediate release or for a reversal of the Board's revocation decision and a new hearing before the IPRB. The chancery court noted that, although Cannon had entered a guilty plea in 2001, he had not admitted guilt, stipulating only that the factual basis presented by the State was sufficient to support a conviction. The chancery court ordered a new hearing for Cannon before the IPRB, and directed the Board to reconsider its revocation of Cannon's parole without any reliance on Cannon's confession or on Tyrone's grand jury testimony, which Tyrone later asserted was also a product of police coercion. On reconsideration, the IPRB released Cannon on parole. By that point, Cannon had been in prison for twenty-three years following his arrest for Ross's murder.

In the meantime, in 2005, after the State agreed to dismiss the substantive case against him, Cannon filed this suit under 42 U.S.C. § 1983, seeking damages from the City of Chicago, the officers involved in his torture, and other City employees involved in covering up the torture.[5] Cannon's claims against the City of Chicago and City employees (hereafter "the City Defendants") included (1) deprivation of the right to a fair trial; (2) false arrest and false imprisonment; (3) torture and physical abuse; (4) coercive interrogation; and (5) a *Monell* policy claim. *See Monell v. Dept of Social Servs. of City of New York*, 436 U.S. 658 (1978). Cannon also asserted state law claims against these same defendants, including (1) false arrest and imprisonment; (2) malicious prosecution; (3) intentional infliction of emotional distress; (4) conspiracy; (5) *respondeat superior*; and (6) indemnification. The district court concluded that the plain language of the 1988 Stipulation that Cannon signed settling his original claims against the City and the original defendants precluded Cannon from bringing new claims against the City Defendants. The court then considered whether the 1988 Stipulation could be invalidated because of the City Defendants' fraudulent concealment or under the doctrine of unconscionability. The court ultimately held that neither doctrine could save Cannon's present lawsuit in light of the broad release he signed in settling the 1986 case. *Cannon v. Burge*, 2006 WL 273544 (N.D. Ill. Feb. 2, 2006) ("*Cannon II*"); *Cannon v. Burge*, 2007 WL 2278265 (N.D. Ill. Aug. 8, 2007) ("*Cannon III*"); *Cannon v. Burge*,

---

[5]   Cannon also sued Cook County, the Cook County State's Attorney Richard Devine, and the Cook County State's Attorney's office, but those parties are not a part of this appeal.

2011 WL 4361529 (N. D. Ill. Sept. 19, 2011) ("*Cannon IV*"). Cannon appeals.

## II.

On appeal, Cannon contends that the defendants should not benefit from a settlement agreement that was secured by fraud. He argues that the 1988 Stipulation could not bar claims that did not yet exist and were not contemplated by the parties at the time of the settlement. Cannon also asserts that the defendants' conduct placed him in such a grossly unequal bargaining position that it would be unconscionable to hold him to the terms of the 1988 Stipulation. Finally, he maintains that the district court erred when it refused to allow him to amend his complaint to add a civil RICO claim.[6] We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Cannon and construing all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012); *Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422,

---

[6] The district court denied Cannon's motion to amend his complaint to add a civil RICO claim, citing our decision in *Evans v. City of Chicago*, 434 F.3d 916 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). Cannon sought damages for lost employment opportunities during the time he was imprisoned. In *Evans*, we held that "foregone earnings stemming from the lost opportunity to seek or gain employment are, as a matter of law, insufficient to satisfy § 1964(c)'s injury to 'business or property' requirement where they constitute nothing more than pecuniary losses flowing from what is, at base, a personal injury." 434 F.3d at 930-31. Cannon concedes that *Evans* controls but asks us to revisit the question. We decline to do so.

428 (7th Cir. 2010). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Naficy*, 697 F.3d at 509.

## A.

We begin with the 1988 Stipulation itself. Cannon and the City Defendants agree that the 1988 Stipulation settling the original suit is a contract governed by Illinois law. *Cushing v. Greyhound Lines, Inc.*, 991 N.E.2d 28, 92 (Ill. App. 1st Dist. 2013) (a settlement agreement is considered a contract, and construction and enforcement of settlement agreements are governed by principles of contract law). *See also Haisma v. Edgar*, 578 N.E.2d 163, 168 (Ill. App. 1st Dist. 1991) (same). A release within a settlement agreement also is governed by contract law. *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991); *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984). The parties disagree about the scope of the release in the 1988 Stipulation, and whether we may consider extrinsic evidence in determining the scope. "Where a written agreement is clear and explicit, a court must enforce the agreement as written. Both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids." *Rakowski*, 472 N.E.2d at 794. *See also Whitlock*, 581 N.E.2d at 667 ("[t]he intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law"); *Hurd v. Wildman, Harrold, Allen & Dixon*, 707 N.E.2d 609, 613 (Ill. App. 1st Dist. 1999) (where a written agreement is clear

and explicit, a court must enforce the agreement as written without the assistance of parol evidence or any extrinsic aids); *Haisma*, 578 N.E.2d at 163 (where there is no ambiguity in the language of a settlement agreement, the determination of the intent of the parties is governed by the contract language alone). In contrast, when a contract is ambiguous, construction of the agreement is a question of fact, and the finder of fact may consider parol evidence in determining the intent of the parties. *Whitlock*, 581 N.E.2d at 667.

In order to determine the scope of the release, we must therefore consider whether the contract is "clear and explicit" or whether it is ambiguous. In Illinois, a contract is considered ambiguous if it is capable of being understood in more than one sense. *Whitlock*, 581 N.E.2d at 667; *Farmers Auto. Ins. Ass'n v. Kraemer*, 857 N.E.2d 691, 693 (Ill. App. 5th Dist. 2006). Cannon, who was represented by counsel in the 1988 settlement, signed a Stipulation that purported to be "a final and total settlement of all claims he has, or may have in the future, arising either directly or indirectly out of the incident which was the basis of this litigation, and that such finality is applicable to the remaining Defendant, the CITY OF CHICAGO, its officers, agents and employees."

Cannon does not assert that any particular part of the Stipulation is "capable of being understood in more than one sense." *Whitlock*, 581 N.E.2d at 667. Instead, he points to a number of decisions in the appellate courts in Illinois that appear to allow the consideration of parol evidence in determining the intention of the parties, even when there is no ambiguity on the face of the contract. For example, in *Carlile v.*

*Snap-on Tools*, 648 N.E.2d 317 (Ill. App. 4th Dist. 1995), the court commented:

> It is sometimes said that a release is a contract, and the same rules which apply to other contracts (particularly the parol evidence rule) apply to releases. It appears, however, that the courts are much more careful in applying the parol evidence rule to releases than they are to other contracts. The intention of the parties controls the scope and effect of a release, and this intent "is discerned from the language used *and the circumstances of the transaction*."

648 N.E.2d at 321 (quoting *Carona v. Illinois Cent. Gulf R.R. Co.*, 561 N.E.2d 239, 242 (Ill. App. 5th Dist. 1990) (emphasis supplied in *Carlile*)). *See also Carona*, 561 N.E.2d at 242 ("It is well established that the intention of the parties controls the scope and effect of the release, and that this intent is discerned from the language used and the circumstances of the transaction."); *Chubb v. Amax Coal Co.*, 466 N.E.2d 369, 372 (Ill. App. 5th Dist. 1984) (the intention of the parties controls the scope and effect of a release, and this intent is discerned from the language used and the circumstances of the transaction); *Whitehead v. Fleet Towing Co.*, 442 N.E.2d 1362, 1365 (Ill. App. 5th Dist. 1982) (the intention of the parties controls the scope and effect of the release and such intent is discerned from the language used and the circumstances of the transaction).

So there are two seemingly inconsistent lines of cases in Illinois regarding whether a court may consider parol evidence in interpreting an unambiguous settlement agreement. The

inconsistency can be resolved, though, by following the "circumstances of the transaction" language back to its source. To do so, we must travel nearly 150 years, to a decision of the Illinois Supreme Court interpreting a release that was procured by fraud. *See Parmelee v. Lawrence*, 44 Ill. 405 (1867); 1867 WL 1574 (Ill. 1867). *Parmelee* addressed (and rejected) a strict common law rule that "the full release of one of several joint tortfeasors released all, even if the release contained an express reservation of rights against the others." *Porter v. Ford Motor Co.*, 449 N.E.2d 827, 829 (Ill. 1983) (interpreting *Parmelee*). In *Parmelee*, Lawrence signed a release after he was first presented with two other draft releases. With each of the earlier drafts, Lawrence feared that the release of one obligor would impair his claims against co-obligors. He therefore refused to sign those drafts. He was then presented with a draft that expressly purported to reserve his claims against co-obligors, and he was led to believe it would have that effect. There was evidence that the drafter of the document likely knew that the reservation would be trumped by the common law rule. In that instance, where the document on its face unambiguously reserved Lawrence's claims against the co-obligors, the Illinois Supreme Court refused to apply the strict common law rule that releasing one obligor would operate to release all:

> But a release, like every other written instrument, must be so construed as to carry out the intention of the parties. This intention is to be sought in the language of the instrument itself when read in the light of the circumstances which surrounded the transaction.

*Parmelee*, 44 Ill. 405; 1867 WL 1574 at *3. The court considered the circumstances surrounding the signing of the release and pronounced it "a dishonest scheme." *Parmelee*, 44 Ill. 405; 1867 WL 1574, at *4. The court rejected older cases adhering to the strict common law rule and found that "the weight of the modern authorities is against these cases, and in favor of the more reasonable rule, that where the release of one of several obligors shows upon its face, and in connection with the surrounding circumstances, that it was the intention of the parties not to release the co-obligors, such intention, as in the case of other written contracts, shall be carried out[.]" *Parmelee*, 44 Ill. 405, 1867 WL 5174, at *5.

The Illinois Supreme Court had an opportunity to interpret *Parmelee* more than one hundred years later. In *Porter*, a bank representing the estate of the plaintiff's husband settled a negligence action against a driver who caused a crash that resulted in his death. The bank, as administrator of the estate, signed a settlement broadly releasing the driver, his insurer, and any person or company liable "in his stead" from all claims arising from the husband's death. The plaintiff then sought to sue Ford Motor Company, the manufacturer of the Ford Pinto that her husband was driving at the time of his death. Relying primarily on *Parmelee*, the plaintiff contended that the

> court should have focused on the intent of the parties in executing the release rather than looking at the language of the document standing alone. The intent of the parties … was to release only [the driver] and his insurer from liability. The prime indicator of this intention … is that at the time the

document was executed, the only defendant in the lawsuit was [the driver] and a claim against Ford had not even been contemplated by the plaintiff.

*Porter*, 449 N.E.2d at 829. The Illinois Supreme Court disagreed with this broad reading of *Parmelee* and noted that:

The *Parmelee* holding does not require … that a release be construed as a release of only those persons expressly named. Rather, it holds that an unconditional release of one co-obligor releases all unless a contrary intent appears from the face of the instrument.

*Porter*, 449 N.E.2d at 830. Because the release contained no express reservation of rights against other parties but instead was a "full or unqualified release as to one indivisible injury given to any of those concurring in its cause," the release served as a bar to the plaintiff's claims against Ford Motor. *Porter*, 449 N.E.2d at 830-31. This was so even though at the time the release was signed, the plaintiff had not yet contemplated a claim against Ford. *Porter*, 449 N.E.2d at 829.

What does all of this mean for Cannon? *Parmelee* cannot reasonably be read to uniformly allow the consideration of parol evidence in interpreting an unambiguous release. In reality, *Parmelee* chronicled an instance of fraud in the inducement. *See Jordan v. Knafel*, 880 N.E.2d 1061, 1069 (Ill. App. 1st Dist. 2007) (fraud in the inducement of a contract is a defense that renders the contract voidable at the election of the injured

party).[7] In fact, the *Parmelee* court held the parties to the unambiguous language of the release even though the common law rule held to the contrary. To hold otherwise would have allowed the drafter of the document to fraudulently induce Lawrence to sign a release that had the opposite effect of its plain, unambiguous language. The Illinois courts of appeal appear to have taken the "circumstances of the transaction" language from *Parmelee* out of context and applied it broadly to allow the consideration of parol evidence in construing the intent of the parties to an unambiguous release. But the Illinois Supreme Court has embraced no such rule, instead consistently holding that, when a contract is unambiguous on its face, the intent of the parties must be construed without consideration of parol evidence. *Whitlock*, 581 N.E.2d at 667; *Rakowski*, 472 N.E.2d at 794. Our role in interpreting a question of state law is to predict how the highest court of the state would answer the question. *In re Crane*, 742 F.3d 702, 707-08 (7th Cir. 2013) (for a question of state law, our role is to predict how the Illinois Supreme Court would decide the question); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615 (7th Cir. 2013) (in diversity action, we must predict how the state's highest court would answer the question if asked). In this instance, we have no need to predict how the Illinois Supreme Court would rule: the court has already spoken. We

---

[7] As was the case in *Parmelee*, "the party seeking such relief must establish that the representation was: (1) one of material fact; (2) made for the purpose of inducing the other party to act; (3) known to be false by the maker, or not actually believed by him on reasonable grounds to be true, but reasonably believed to be true by the other party; and (4) was relied upon by the other party to his detriment." *Jordan*, 880 N.E.2d at 1069.

may not consider parol evidence in construing the unambiguous terms of the release here. Whether Cannon was fraudulently induced to sign the 1988 Stipulation is a separate question that we will consider below, but we must first determine the terms of the unambiguous 1988 Stipulation from its plain language.

The broad release that Cannon signed in 1988 included all of the claims "arising either directly or indirectly out of the incident which was the basis of this litigation[.]" R. 28-2, at 39. The incident that served as the basis for Cannon's 1983 *pro se* complaint also supplied the basis for Cannon's current claims. All of the claims arise from Cannon's torture by Byrne, Dignan and Grunhard on November 2, 1983. That torture led to Cannon's purportedly false confession, which twice led to his conviction for Ross's murder. Cannon also agreed to a "final and total settlement of all claims he has, *or may have in the future*," arising from the incident underlying the 1983 suit. That language unambiguously includes claims that Cannon asserts he did not contemplate until after the settlement, including claims that he alleges did not accrue until after the settlement. *See Rakowski*, 472 N.E.2d at 794-95 (giving effect to a settlement that released any and all claims "on account of all injuries, known and unknown, … which have resulted or may in the future develop from an accident which occurred"); *Hurd,* 707 N.E.2d at 613 (finding clear and unambiguous a release that bars claims "whether known or unknown, or suspected to exist" arising from the plaintiff's partnership in the defendant's firm).

Although Illinois courts construe more narrowly general releases that are unlimited in scope, the release here is limited

to future claims that arise from the subject of the first law suit. *See Rakowski*, 472 N.E.2d at 794. In *Rakowski*, the Illinois Supreme Court held that a party was bound by a release "from any and all claims … of any kind or nature whatsoever, and particularly on account of all injuries, known and unknown … which have resulted or may in the future develop from" a particular accident. 472 N.E.2d at 794. The court rejected a party's position that he did not intend to release a claim for contribution that did not yet exist at the time of the settlement and was not specifically enumerated in the release. Instead, the court declined to consider parol evidence of that party's intent and applied the unambiguous language of the release. Any unilateral mistake about the effect of an unambiguous release was not a sufficient ground to set aside the release. *Rakowski*, 472 N.E.2d at 794. Cannon attempts to carve out his claims for wrongful conviction and malicious prosecution as separate and distinct incidents not covered by the settlement. But this ignores both the "arising from" language in the 1988 Stipulation and the reality that these claims did in fact exist at the time he executed the 1988 Stipulation. That is, he had already been wrongfully convicted as a result of what he asserts to be a malicious prosecution. That he could not bring these claims until his conviction was set aside is irrelevant to the clear language of the 1988 Stipulation, which releases the defendants from all claims "arising from" the initial incident. We therefore agree with the district court that the release covers all of the claims in Cannon's current suit against the City Defendants.

**B.**

Our conclusion that the release covers all of the claims in Cannon's current complaint is not the end of the matter. Once

a defendant establishes the existence of a release that is legal and binding on its face, the burden shifts to the plaintiff to prove it invalid by clear and convincing evidence. *Hurd*, 707 N.E.2d at 613. Cannon asserts that the City Defendants engaged in fraud and a cover-up of the true facts that caused him to settle on unfavorable terms. He relies largely on our opinion in *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), for the proposition that a settlement does not bar additional litigation when it is procured by fraud and a cover-up so massive that the plaintiff was deprived of meaningful access to the courts. Cannon asserts that the record contains evidence of fraud that is adequate to create a genuine issue of material fact regarding whether he should be held to the terms of the 1988 Stipulation. The City Defendants argue that Cannon has failed to make out a claim for fraudulent inducement or fraudulent concealment in the execution of the 1988 Stipulation, and that *Bell* is distinguishable. We will first address whether Cannon raises a genuine issue of material fact regarding fraud in the inducement, and then we will turn to *Bell*.

## 1.

Fraud in the inducement of a contract is a defense that renders the contract voidable at the election of the injured party. *Jordan*, 880 N.E.2d at 1069. The elements of a claim for fraudulent inducement are well-settled in Illinois:

Broadly speaking, for a misrepresentation to consti-
tute fraud which invalidates a contract, it must be a
representation in the form of a statement of a mate-

> rial fact, made for the purpose of inducing a party to act; it must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true; and the party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement.

*Wilkinson v. Appleton*, 190 N.E.2d 727, 729-30 (Ill. 1963). *See also Jordan*, 880 N.E.2d at 1069. The problem for Cannon is immediately apparent. When he signed the 1988 Stipulation, he knew that Byrne, Dignan and Grunhard were lying. He was, after all, a witness to his own torture and he knew what had really happened. When he agreed to settle the case, he could not have reasonably believed their statements to be true, and could not have reasonably relied on the truth of their statements in signing the 1988 Stipulation. *See Siegel Dev., LLC v. Peak Const. LLC*, 993 N.E.2d 1041, 1060 (Ill. App. 1st Dist. 2013) (as part of its fraud claim, a plaintiff must show that its reliance on the misrepresentation was justified; in other words, the reliance must be reasonable); *D.S.A. Fin. Corp. v. County of Cook*, 801 N.E.2d 1075, 1081 (Ill. App. 1st Dist. 2003) (a person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another).

In determining whether Cannon reasonably relied on the defendants' lies, we must take into account all of the facts which Cannon knew, as well as those facts that Cannon could have learned through the exercise of ordinary prudence. *Siegel*

*Dev.*, 993 N.E.2d at 1060. Cannon knew the officers were lying when they denied torturing him but he asserts he did not know about the broader torture scandal that implicated these same officers. The record reveals that, at the time he was contemplating settlement, both Cannon and his lawyer suspected that the officers had tortured others and Cannon had directed his lawyer to further investigate both the officers and those other incidents. But his attorney never asked any of the defendants in the original suit or any of the extended list of defendants in the current suit any questions about the officers' torture of other suspects. Cannon contends that any failure to pursue additional discovery should not be held against him because the officers who lied about torturing him surely would have lied about torturing others. He is undoubtedly correct that those officers would have lied again but there were many other avenues for discovery that his lawyer could have employed and failed to do so. In support of his claim of a cover-up by City officials, Cannon cites, among other things, the Goldston Report[8] and the results of re-investigations conducted by OPS,[9]

---

[8] On September 28, 1990, OPS investigator Michael Goldston completed a report that identified fifty victims of torture by officers in Area 2, dating from May 1973 through October 1986. The Goldston Report concluded that systematic abuse and torture was carried out at Area 2 and that command officers at Area 2 were aware of the abuse and helped perpetuate it by either actively participating in the abuse or by failing to stop it. R. 391-5, at 2-26. In November 1990, Gayle Shines, the Chief Administrator of OPS, approved the Goldston Report and forwarded it to Superintendent of Police LeRoy Martin. R. 391-5, at 1.

[9] In 1993, OPS re-opened investigations into certain cases of torture in
(continued...)

all of which City officials attempted to conceal in litigation by other plaintiffs. But all of this evidence came into existence *after* Cannon settled his claims. The City's attempt to conceal this evidence also came *after* Cannon settled. Lawyers for other plaintiffs vigorously pursued these leads and uncovered the scandal. It is impossible to say whether additional discovery by Lanphier on Cannon's behalf would have uncovered the broader police torture scandal that has now been brought to light. But Cannon has failed to raise a genuine issue of material fact regarding the reasonableness of his reliance on the officers' false statements at the time he signed the 1988 Stipulation, especially in light of his failure to seek additional information in the original litigation.

## 2.

Cannon relies heavily on our decision in *Bell* to overcome the deficiencies in his fraud-in-the-inducement claim. The defendants contend that *Bell* is distinguishable and so we turn to the facts of *Bell*. On February 2, 1958, Milwaukee police officer Thomas Grady shot and killed Daniel Bell, a young African-American man the officer had pulled over for a broken tail-light. Grady and Louis Krause, another officer who had participated in chasing Bell, immediately fabricated a story to

---

[9] (...continued)
which the OPS had previously concluded that the allegations of abuse were "not sustained." In a number of cases, investigators changed the recommended finding to "sustained," including in Cannon's case. No action was taken on those recommendations until 1998, when Thomas Needham, General Counsel to the Superintendent, instructed OPS to once again classify all of the allegations as "not sustained." R. 391-7, at 62.

justify what they knew was an unwarranted shooting. When other officers arrived to investigate, Grady told them that he stopped Bell's car for a broken tail-light, and that Bell ran once the car was stopped. Grady said that he believed Bell fit the description given in a police bulletin of a man wanted for armed robbery. Together with Krause, he told the investigators that Bell yelled, "You won't catch me. I'm a holdup man," as he ran. Grady planted a knife in Bell's hand and told the investigators that he shot at Bell as Bell fled. Grady later changed the story, claiming that he fired at Bell after Bell lunged at him with the knife. Bell's family heard about the shooting on the evening news. They went to the police station and asked for an explanation. An officer repeated the story given by Grady and Krause and presented the knife as evidence. Bell's sister, who knew that Bell's knife was at home, disputed the claim and pointed out that Bell was left-handed and the knife was recovered from his right hand. At that point, the officer responded with racial epithets, and ejected the family from the station with threats of arrest.

The subsequent internal investigation revealed inconsistencies in the stories given by Grady and Krause. For example, the officers had given several different accounts of the distance between Grady and Bell when the shots were fired. And Grady changed the story to include the detail of Bell lunging with the knife. Rather than ascertain the truth, superior officers and the district attorney told Grady and Krause to make their stories consistent. An extensive cover-up followed. The officers repeated their lies to journalists, investigators, and at the coroner's inquest into the death of Daniel Bell. At the inquest, Grady amended the estimated distance from which he fired to

match the findings of the autopsy. The district attorney and the deputy medical examiner facilitated a biased examination of the witnesses. With no opportunity for cross-examination, questions from Bell's family were ignored. As a result, the inquest jury returned a verdict that the killing was justifiable, a finding that all but destroyed any chance of holding the officers liable for civil damages.

Bell's family, nevertheless, did not believe the officers' story and his father, Dolphus Bell, brought an action in state court against Grady and the City of Milwaukee for wrongful death and indemnification, seeking damages in the amount of $18,125, at that time the statutory maximum. Throughout the litigation, the defendants continued to claim that Bell had announced that he was a "hold-up man," had lunged at Grady with a knife, and that Grady shot him in self-defense. After a mistrial, the case was reassigned to a second judge who urged the parties to settle. After initially agreeing orally to a settlement of $1800, Dolphus Bell refused to sign the agreement and refused to accept the City's check.

Nearly twenty years after the shooting, Krause approached the district attorney and admitted that he and Grady had lied about the shooting. He told the prosecutor that Bell had not lunged at Grady and that Grady had planted the knife in Bell's hand. The district attorney arranged a wiretap, and in conversations with Krause, Grady admitted on tape that he planted the knife and that the shooting was accidental. Eventually, Grady pled guilty to homicide by reckless conduct and perjury.

In 1979, Bell's siblings (on behalf of themselves and their now-deceased father) filed suit in federal court against Grady,

the City of Milwaukee, the police chief, the detective who investigated the shooting, the county and the office of the District Attorney. In addition to civil rights claims for excessive force and deprivation of life without due process, the siblings also alleged that the defendants conspired to conceal the facts of the shooting, that the conspiracy interfered with their ability to bring their claims against Grady and the City of Milwaukee, that the conspiracy deprived them of due process and equal protection, and that these deprivations were compensable under sections 1981, 1983, 1985 and 1986. A jury found that Grady violated Bell's constitutional rights by shooting and killing him and also found that Grady, Krause and other City defendants conspired to cover up the facts of the shooting and killing of Daniel Bell. The jury concluded that Bell's race was an operative factor in the conspiracy.

On appeal, the *Bell* defendants raised a number of claims but only one is relevant to Cannon's appeal: the defendants' argument that the Bell family's claims were precluded by the earlier settlement agreement and by *res judicata*. Prior to the trial, the district court had rejected these defenses. The district court concluded that Dolphus Bell had entered into a binding settlement agreement with Grady and the City of Milwaukee but ruled that *res judicata* could not be applied when the record was replete with allegations of fraud, concealment, and a broad-based cover-up on the part of the defendants. The district court re-affirmed that ruling after the verdict:

> [T]he fraud in this case is sufficient to nullify an otherwise valid settlement and dismissal. This is not a case in which the defendant simply lied and thereby made the plaintiff's proof of his case diffi-

> cult. Rather, this is a case of massive conspiracy by
> high ranking Milwaukee officials to prevent the
> disclosure of the true facts of the shooting of Daniel
> Bell. Given the monopoly on force held by the
> government, this conspiracy prevented the proper
> functioning of the judicial system.

*Bell*, 746 F.2d at 1227 (quoting *Bell v. City of Milwaukee*, 536
F.Supp. 462, 465-66 (D.C. Wis. 1982) (hereafter *Bell II*)).

On appeal, we agreed that *res judicata* should not apply.
*Bell*, 746 F.2d at 1227. Ordinarily, we are obligated to afford full
faith and credit to judicial proceedings in state courts of
competent jurisdiction, and we apply the concepts of *res
judicata* and collateral estoppel as they would be employed by
the courts of the state in which the prior judgment was
rendered. In Bell's case, the prior judgment was rendered by a
Wisconsin state court, and under Wisconsin law, "a state court
judgment has no binding effect in subsequent litigation where
the plaintiff proposes to rely on evidence that he or she was
unable or failed to present in the first action on account of the
defendant's fraud or concealment." *Bell* 746 F.2d at 1227 (citing
*Hammes v. First Nat'l Bank & Trust Co. of Racine*, 255 N.W.2d
555, 559-60 (Wis. 1977)). We agreed with the district court that
the earlier settlement did not bar the subsequent action under
the rationale of *Hammes*. Moreover, we held that the policy in
*Hammes* applied "notwithstanding defendants' argument that
the Bell family and their attorneys knew from the very begin-
ning that the police must have been lying and covering up the
true circumstances of the shooting." *Bell*, 746 F.2d at 1227.

Although the evidence suggested that Bell's family knew from the start that the police had lied,

> the Bell family, with their beliefs alone, were deprived of a fair opportunity to seek redress by virtue of defendants' fraudulent concealment of facts crucial to the fair disposition of the dispute. Not only did Grady and others cover up what actually happened the night of the shooting, but, according to the testimony of Sylvia White Bell, when some members of the Bell family went to the police that night for an explanation, they were told "niggers get out of here," or be jailed. At the coroner's inquest, conducted as a non-adversarial proceeding without opportunity for cross-examination, Bell family questions were largely ignored.

*Bell*, 746 F.2d at 1227-28.

We noted that in the original action brought by Dolphus Bell, the defendants continued to rely on Grady's false representations made at the time of the shooting. We rejected as irrelevant the defendants' contention that Dolphus Bell failed to seek discovery in the original action. We reasoned that, even if the elder Bell had sought discovery, the defendants had not established that he would have been able to obtain sufficient documentary and testimonial evidence to overcome the inquest finding of justifiable homicide, a finding that was facilitated with perjured testimony and a biased investigation. The cover-up implicated high-ranking members of the police department, as well as the district attorney's office and even the medical examiner. Not until Krause came forward twenty

years later and revealed the truth could the Bell family fairly present their case:

> Thus regardless of whether the settlement was valid when allegedly entered into, it cannot be used to preclude future claims and in so doing redound to the benefit of defendants.

*Bell*, 746 F.2d at 1228. Finally, we noted that even if the original settlement were given preclusive effect, Bell's siblings would still have a civil rights claim for damages arising from the defendants' acts of concealment continuing past the prior action. *Bell*, 746 F.2d at 1228.

**3.**

We have not had many occasions to apply the reasoning of *Bell* in the thirty years since its issuance, and that is as it should be. Extraordinary circumstances called for an extraordinary resolution. The district court had two opportunities to consider whether *Bell* could relieve Cannon of the preclusive effect of the 1988 Stipulation: first on the defendants' motion to dismiss, and later on the defendants' motion for summary judgment. At the motion to dismiss stage, the district court first concluded (as have we) that the broad language of the release covered all of the claims that Cannon now raises. But the court also found that Cannon had alleged sufficient facts in support of claims of fraud and unconscionability to overcome the preclusive effect of the earlier settlement. The court relied in part on *Bell* in reaching that conclusion. At the summary judgment stage, the court reversed course and found that Cannon's situation was distinguishable from Bell's because Cannon had first-hand knowledge of his torture and abuse and was thus aware from

the beginning that he had a cause of action against the officers. In particular, the district court found determinative that Cannon knew before he signed the 1988 Stipulation that he had been tortured, and he suspected that Area 2 officers had tortured others. Cannon's criminal defense lawyer was aware of another complaint against Area 2 officers, and Cannon went so far as to direct his civil attorney to look into the arrest records of the officers involved to determine how many of their interrogations ended in confessions or charges of torture. The district court found that the officers' denial of Cannon's allegations did not constitute fraud, and that Cannon had failed to produce any evidence supporting his claim that the City itself had participated in a cover-up prior to the settlement. Bell, on the other hand, was killed by the officers, and their concealment of the facts prevented Bell's relatives from pursuing his constitutional claims. In other words, the district court concluded, the officers' concealment of the facts prevented Bell's family from realizing they had a cause of action in the first place.

On appeal, Cannon asserts that his knowledge of his torture does not meaningfully distinguish his case from that of Bell. The City Defendants engaged in a decades-long cover-up that deprived him of a fair opportunity to seek meaningful redress in the courts, he contends, and a straight-forward application of *Bell* bars the defendants from relying on the 1988 Stipulation. The City Defendants continue to assert that Cannon knew he had been tortured and thus was in full possession of the relevant facts giving rise to his civil rights claims, unlike the Bell family, who had "their beliefs alone" to aid them in uncovering the truth. The City Defendants dismiss as irrele-

vant Cannon's claim that he was in no position to prove his claims of abuse because he was in prison for murder as a result of the false confession he gave under the officers' torture. According to the defendants, Cannon had credibility problems far beyond his conviction in Ross's murder, and the officers' denial of their conduct could not constitute fraud in any case because Cannon knew the truth and was not relying on the officers' assertions when he signed the 1988 Stipulation. Nor could there have been any fraud by the City itself, the defendants argue, because Cannon did not assert a *Monell* claim in his initial lawsuit and never sought discovery or information from the City. Because Cannon did not ask the City for information about other instances of torture, he cannot complain now that the City concealed the information, according to the defendants.

We agree with the district court that *Bell* is distinguishable, and we look to the two cases in which we have had an opportunity to apply *Bell* to demonstrate the differences. We note, though, that neither of these cases involved a settlement followed by a second attempt at litigation. Rather, both addressed free-standing claims of denial of access to the courts. Nevertheless, these two cases aid our understanding of *Bell*. The "cornerstone of our decision in *Bell* was that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access." *Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir. 1995). In *Vasquez*, a woman was injured by a stray bullet fired by an off-duty, drunken Cicero police officer. On-duty Cicero officers who investigated the shooting did nothing more than retrieve the bullets that landed in Vasquez's home and determine that

the off-duty officer firing the shots was drunk. They then took no action on the evidence for several months. An independent investigation conducted by state, county and federal officials concluded that a group of off-duty Cicero officers attending a Super Bowl party had set up a target in an officer's residential backyard, and proceeded to fire multiple shots. Some of those shots ended up in Vasquez's home, including the bullet that injured her. The officers were reprimanded and the results of the investigation were provided to Vasquez.

Vasquez then sued both the off-duty officers who fired the shots and the original investigating officers from Cicero. She alleged that the Cicero officers conspired to cover up and impede the investigation, and she sought damages under section 1983 for deprivation of the constitutional right to seek judicial relief for her injuries, relying on *Bell*. We noted that "the right of individuals to pursue legal redress for claims which have a reasonable basis in law and fact is protected by the First and Fourteenth Amendments." *Vasquez*, 60 F.3d at 328. A corollary of this right is that efforts by state actors to impede an individual's access to courts may provide the basis for a constitutional claim under section 1983. Citing *Bell* and *Bounds v. Smith*, 430 U.S. 817, 822 (1977), we reasoned that judicial access must be adequate, effective, and meaningful, and "therefore, when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged." *Vasquez*, 60 F.3d at 328.

We distinguished *Bell*, however, because the cover-up failed and there were no allegations that the plaintiffs were pre-

vented from pursuing a tort action in state court or that the value of such an action had been reduced by the cover-up. Although the Vasquezes were delayed for approximately six months from learning the facts in support of their claims, ultimately they suffered no prejudice and in fact were able to use the information discovered during the multi-jurisdictional investigation into the circumstances of their injury and the ensuing cover-up by local police officers. In contrast, Bell's family was delayed from seeking justice for nearly twenty years and suffered prejudice that was "extraordinary and extreme." *Vasquez*, 60 F.3d at 329.

Similarly, in *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994), we found *Bell* distinguishable from the case of a man who was injured by police officers during his arrest. Boggs was a police officer who attempted to pull Thompson over for driving his motorcycle with a suspended license. Thompson led Boggs on a high-speed chase that ended when Thompson collided with another squad car and was thrown to the pavement. Boggs then restrained Thompson on the ground by placing his leg across Thompson's back in order to handcuff him. Thompson later learned he had suffered a compression fracture of a vertebrae in his lower back. He sued Boggs, claiming, among other things, that the officer denied him his First Amendment right of access to the courts when he failed to reveal in his police report that he had used excessive force in arresting Thompson. 33 F.3d at 849-50. In particular, he complained that Boggs excluded from the report that Boggs lifted him up from the pavement, threw him back on the pavement onto his stomach, and then jumped on his back with a large amount of force. *Thompson*, 33 F.3d at 852.

We concluded that Thompson's case was distinguishable from Bell's in several important respects. Most significantly, Thompson was not deprived of meaningful access to the courts "because he was personally involved in the incident and thus had firsthand knowledge of all the facts and circumstances surrounding his arrest." 33 F.3d at 852. Thompson knew that an officer landed a blow to his back during the arrest, and was able to secure two independent witnesses to the events. "Finally, the facts known to Thompson concerning the arrest were sufficient to enable him to promptly file the instant lawsuit unlike Bell, where the true facts were concealed thereby denying [Bell's family] the opportunity to file a lawsuit until some twenty years after the fact." 33 F.3d at 852-53.

We note again that neither *Vasquez* nor *Thompson* addressed a settlement followed by a subsequent lawsuit involving the same facts. Both involved straight-forward claims of denial of meaningful access to the courts. In each case, we ultimately distinguished *Bell* because the plaintiffs were in fact able to file their claims in a timely manner, and knew the relevant facts of their claims at the time the claims arose (as was the case in *Thompson)* or soon thereafter (as occurred in *Vasquez*). Similarly, Cannon knew the facts that gave rise to his claims at the time the claims arose. Like Thompson, he knew first-hand that he had been abused by the officers, that he had falsely confessed and that his false confession had contributed to his conviction. Like Thompson, he knew that the officers were lying or omitting relevant facts from their later accounts of their actions. Like Thompson, the facts known to Cannon were sufficient to enable him to promptly file his lawsuit. Cannon's case, in other words, presented a typical he-said/they-said

controversy; in Bell's case, only the officers' side of the story existed.

Moreover, in Bell's case, there was an immediate, top-down cover-up of the facts, with higher ranking officers and the district attorney directing the wrong-doers to synchronize their stories. When seeking information about the shooting, Bell's family was sent away from the police station with race-based threats to leave or face arrest. The inquest was conducted in a biased fashion and as a non-adversarial proceeding in which the questions of the Bell family were ignored. The inquest's conclusion that the shooting was justified presented a significant road-block to the Bell family's civil suit. In contrast, at the time that Cannon settled his case and signed the 1988 Stipulation, so far as the record reveals, there was not yet a cover-up of Cannon's case by higher ranking officials. Cannon has no evidence that the defendants actively discouraged him from seeking discovery or learning the truth, as happened to Bell's family when they approached the police for an explanation of Daniel's death. Indeed, Cannon suspected that others had been tortured and he was aware of public reports of some incidents prior to the settlement. Almost certainly, the officers directly involved in Cannon's torture lied in their depositions and to OPS investigators. But Cannon has presented no evidence that the City knew the officers were lying during the first OPS investigation or that the City thwarted Cannon's efforts to obtain discovery or learn the facts of his torture. In fact, Cannon's lawyer did not seek discovery from the City regarding other instances of torture prior to advising Cannon to settle the case, and so the City had no opportunity to influence Cannon's decision by failing to disclose this information. As for

the officers' conduct in lying during their depositions, as we explained above, Cannon knew the officers were lying and knew all of the relevant facts giving rise to his claims; he faced a typical credibility contest. Bell's family suspected but did not know what happened to Daniel Bell because Daniel was not there to supply a contrary version of events.

Others who were abused by Area 2 officers pursued their claims with more vigor than Cannon and eventually uncovered the broader police torture scandal involving Jon Burge, the officers who worked under him, and the police officials who looked the other way and sometimes actively concealed what they knew about the torture. But at the time Cannon signed the 1988 Stipulation releasing the City and all of its employees from all present and future claims arising from his torture, Cannon was not relying on any false information provided by the City Defendants on the broader torture scandal because he had not sought discovery from the City or the individual defendants on any other incidents involving any other arrestees. Although he now has evidence suggesting that the City behaved deplorably in other litigation after Cannon settled his case, that after-the-fact behavior cannot be said to have induced Cannon to settle his case.

Cannon essentially claims that he would not have settled his case if he had realized that better proof would be available in the future. If he had known that the officers were abusing others, he could have used that information to bolster his own credibility, which had been seriously damaged by his false confession and conviction for the murder of Darrin Ross. We pause for a moment to address the disingenuousness of this argument. First, Lanphier, Cannon's lawyer in the civil case,

advised him to settle in 1988 not because of credibility problems created by his conviction for Ross's murder but because of credibility issues created by Cannon's *first* murder conviction, the one for which he was on parole when he became embroiled in Ross's murder. Lanphier believed that he could have evidence of the second murder conviction excluded at the civil trial. R. 391-7, at 2. Lanphier advised Cannon to settle because the case boiled down to a question of witness credibility and Cannon's *first* murder conviction made it highly unlikely that a jury would accept Cannon's version of the facts over that of the defendants. Cannon's complaint that he litigated under the burdensome weight of his false conviction for Ross's murder rings hollow in light of his lawyer's actual advice at the time of the settlement. Second, Cannon in fact believed that the officers had abused other suspects and had asked his lawyer to pursue discovery about other abuse at Area 2. He settled his case knowing that this evidence—this better proof—might exist, and knowing that his lawyer had failed to pursue it. R. 363-17, at 2 (letter from Cannon to Lanphier accepting the settlement). Cannon took his lawyer to task for not believing that Cannon had been tortured, and for being unwilling "to fight like hell to prove that they did do it." R. 363-17, at 2. The larger problem with Cannon's regret over settling the case is that, unlike the family of Daniel Bell, Cannon knew all of the relevant facts at the time he settled; to the extent he did not know the facts regarding the officers' torture of others, he was well aware that his lawyer opted not to pursue discovery of those facts. Actions taken to conceal the police torture scandal after the settlement, abhorrent though they were, could not and did not induce Cannon to settle.

Finally, we note that *Bell* is distinguishable in a few additional respects. We commented in *Bell* that, even if the settlement reached in the first case brought by Dolphus Bell were given preclusive effect, much of the second suit would not be barred. 746 F.2d at 1228. The settlement reached by Dolphus Bell did not specifically prohibit future litigation for acts of concealment that continued past the prior action. Cannon's settlement with the City did bar future lawsuits arising from the same incident that was the subject of the first lawsuit. Moreover, Bell's siblings were not parties to the first lawsuit and the defendants failed to establish that collateral estoppel would preclude their claims. Cannon, in contrast, was the plaintiff in both suits. In the end, *Bell* simply does not apply, and there is no way to relieve Cannon from the preclusive effect of the 1988 Stipulation and settlement.

**4.**

The City Defendants have consistently argued that this litigation is precluded by the 1988 Stipulation, a settlement agreement that they have asked us to analyze using principles of Illinois contract law. By now, the reader may be wondering why we have been mired in Illinois contract law when the straight-forward principles of *res judicata* would seem to apply. "Under *res judicata*, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979). Here, the district court dismissed with prejudice the first suit against the three officers and entered judgment against the City of Chicago, incorporating by reference the 1988 Stipulation. That constitutes a final judgment on the merits. *See Lawlor v. National*

*Screen Serv. Corp.*, 349 U.S. 322, 327 (1955); *Golden v. Barenborg*, 53 F.3d 866, 871 (7th Cir. 1995). A party asserting *res judicata* or claim preclusion must establish: "(1) identity of the claim, (2) identity of parties, which includes those in 'privity' with the original parties, and (3) a final judgment on the merits." *Ross ex rel. Ross v. Board of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 283 (7th Cir. 2007). Because the earlier judgment was rendered by a federal court, the federal law of claim preclusion applies here. *Ross*, 486 F.3d at 283. "In order to decide whether the two cases involve the same claim, we ask whether they arise out of the same transaction. If they did, whether or not they were actually raised in the earlier lawsuit, they may not be asserted in the second or subsequent proceeding." *Ross*, 486 F.3d at 283.

The elements required for claim preclusion would appear to be present here. After all, Cannon filed his 1986 suit in federal court, asserting claims arising from his torture by three police officers. The settlement (which included the City and all of its employees) that ensued was enshrined in a final judgment by the district court, a judgment that incorporated the 1988 Stipulation by reference. Arguably, the claims in both suits arose from the same operative facts, the parties were identical, and there was a final judgment on the merits. *Bell* itself provided an exception to the normal operation of *res judicata.* Yet the City has not argued the preclusive effect of *res judicata*, instead confining its argument to Illinois contract principles and the 1988 Stipulation. Because *res judicata* is a defense that can be forfeited if not pled, we see no reason to further address the issue. *Arrow Gear Co. v. Downers Grove Sanitary Dist.*, 629 F.3d 633, 638 (7th Cir. 2010). We mention it

only because it seems odd to ignore an issue that is otherwise so obviously implicated by the procedural stance of the case. The City Defendants have confined their defense of the case to principles of Illinois contract law and we have therefore limited our analysis to that defense.

## III.

Cannon next contends that it would be unconscionable to hold him to the terms of the 1988 Stipulation because it is the product of unequal bargaining positions secured by the defendants' fraud. Cannon asserts that he "negotiated under the impossible burden of a conviction for murder," namely his conviction for the murder of Darrin Ross. The defendants, on the other hand, bargained for the settlement from the false position of blameless public servants. According to Cannon, without this handicap, he would have obtained a settlement comparable to those obtained by other plaintiffs who suffered at the hands of Burge and his officers.

The determination of whether a contract or a portion of a contract is unconscionable is a question of law, which we review *de novo*. *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 264 (Ill. 2006). Cannon claims both procedural and substantive unconscionability in the 1988 Stipulation. Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of meaning-ful choice. *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 647 (Ill. 2011); *Kinkel*, 857 N.E.2d at 264. Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed, asking whether the terms are so one-sided as to oppress or unfairly surprise an

innocent party. *Phoenix* 949 N.E.2d at 647; *Kinkel*, 857 N.E.2d at 267.

The facts underlying Cannon's claims of procedural unconscionability are identical to those supporting his claims of fraud in the inducement. That is, he relies on the fact that the officers lied repeatedly, to the OPS, to the trial court, and in their depositions, and in doing so secured his wrongful conviction for murder. That conviction, he argues, placed him in a severely disadvantaged bargaining position. The settlement, he contends, was secured by "years of perjury, obstruction, suppression of evidence, and deceit." At the same time, it is substantively unconscionable, Cannon asserts, because the terms are oppressively one-sided.

We cannot say that Cannon was deprived by the City Defendants of a meaningful choice at the time he settled the case. The factors that we consider in assessing procedural unconscionability "include the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. App. 1st Dist. 1980). *See also Phoenix*, 949 N.E.2d at 647; *Kinkel*, 857 N.E.2d at 264. First, to the extent that Cannon was operating under the burden of a conviction for murder, he brought that burden on himself with his 1971 conviction in the Lazar murder. Lanphier advised Cannon that he would seek to exclude from the civil trial Cannon's conviction for Ross's murder but Lanphier also advised Cannon that the earlier conviction would be admissible. The first murder conviction would seriously damage Cannon's credibility, as would

Cannon's then-membership in the El Rukn street gang. Whether Lanphier was correct about the admissibility (or inadmissibility) of Cannon's murder convictions is irrelevant; at the time Cannon decided to settle, he had only the advice of his lawyer to guide his decision, and that advice excluded the burden of the second conviction. Moreover, Illinois courts have been reluctant to hold that inequality in bargaining power alone suffices to invalidate an otherwise enforceable agreement. *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 110 (Ill. 2006).

Cannon was, of course, represented by counsel when he entered into the 1988 Stipulation, another factor that weighs against a finding of procedural unconscionability. *Fagala v. Sanders*, 488 N.E.2d 1093, 1096 (Ill. App. 5th Dist. 1986). Cannon's letter to his lawyer accepting the settlement reveals that Cannon was deeply dissatisfied with his lawyer but also that he understood what was at stake in settling his case. R. 363-17, at 2. At his deposition, Cannon confirmed that he knew the settlement would end his lawsuit, that no one forced him or threatened him to settle, and that he knew he could take the case to trial. R. 363-11, at 550:5-8; 552:9-553:5.

Moreover, the "years of perjury, obstruction, suppression of evidence, and deceit" occurred largely after Cannon settled his case. True, the officers most directly involved in the torture lied for many years prior to the 1988 settlement, throughout Cannon's criminal and civil proceedings. That would have led to a typical credibility contest in court, and that is not a reason for vacating a settlement agreement. As for the actions of City employees other than the abusive officers, Cannon's lawyer did not question the City Defendants about the torture of

persons other than Cannon himself. Having never asked for the information about the torture of others, Cannon may not now claim that the settlement process was marred by a lack of information about the torture of others. What the officers did to Cannon was unconscionable; the formation of the settlement agreement was not.

As for substantive unconscionability, the whole of Cannon's argument appears to be that plaintiffs who settled with the City after the Burge scandal came to light received far more generous settlements (in some cases, millions of dollars), and it would be unconscionable to hold Cannon to the original $3000 settlement. The City Defendants point out that Cannon's original complaint sought $45,000, and that $3000 is not unconscionable in light of Cannon's "own valuation of his claim at the time of the prior settlement, his self-induced credibility problems, his admitted complicity in Ross's murder, and the public policy of finality."

Illinois law does not support Cannon's claim for substantive unconscionability. Although the unconscionability determination is not restricted to the facts and circumstances in existence at the time the contract was entered into, Cannon was fully aware of the extent of his injury at the time he settled. *See Razor v. Hyundai Motor America*, 854 N.E.2d 607, 621 (Ill. 2006) (courts may consider matters which become known only subsequent to the drafting of the contract—*i.e.*, the type of injuries suffered as a result of breach—in assessing the unconscionability calculus). He did not know that the officers had assaulted others, information that certainly would have bolstered his credibility and probably his recovery, but his lawyer did not seek that information. In *Fagala*, the court

rejected a claim that a plaintiff could avoid a prior settlement by asserting that others in similar circumstances were paid more. *Fagala*, 488 N.E.2d at 1095-96. The court noted that the disparity between the settlements may have been warranted by the difference in the claims against those parties. *Fagala*, 488 N.E.2d at 1096. Other than asserting that the other plaintiffs were also tortured by some of the same officers and received larger settlements, Cannon makes no attempt to demonstrate similarities between the settlement circumstances of other plaintiffs and himself. Without knowing what specific factors led to those settlements, we cannot say that it was unconscionable for Cannon to receive significantly less. "Public policy in Illinois favors settlements and dictates that, absent fraud or duress, settlements should be final." *Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1285 (Ill. App. 5th Dist 2002). *See also Carlile*, 648 N.E.2d at 321 ("Public policy favors the settlement of claims, and it is important that claims, once fairly resolved, not be resurrected"). Again, the fraud exception in these public policy statements refers to fraud in the inducement of the settlement, and Cannon cannot demonstrate that he reasonably relied on misstatements by the City Defendants in executing the 1988 Stipulation. When he settled his claims, he knew for a fact that the officers were lying. He even knew that his lawyer was not pursuing his claims to his satisfaction and that there might have been better evidence to support his claim. He settled anyway. His settlement was not unconscionable and is therefore final.

## IV.

This case casts a pall of shame over the City of Chicago: on the police officers who abused the position of power entrusted to them, on the initial trial judge who was later imprisoned for accepting bribes to fix murder cases, on City officials who turned a blind eye to (and in some instances actively concealed) the claims of scores of African-American men that they were being bizarrely and horrifically abused at Area 2, and last but not least on Cannon himself, who was a convicted murderer out on parole when, by his own admission, he drove a car for his fellow El Rukn general as a murder was committed in the back seat, and then helped dispose of the body and conceal the crime. It is difficult to conceive of a just outcome given the appalling actions by almost everyone associated with these events but the law regarding the finality of settlements governs the result: Cannon brought his suit against those who abused him and settled it knowing full well that those defendants were lying. He has no evidence that, at the time he decided to settle, the City knew about and purposefully concealed a broader scandal in order to induce him to settle. He signed a broad release precluding him from bringing further claims arising from the same set of facts against any of the City Defendants. Final judgments are final for a reason. Cannon failed to raise a genuine issue of material fact on any theory that would relieve him of the preclusive effect of the first judgment. The judgment of the district court is therefore

AFFIRMED.